## UNITED STATES *v.* E. I. DU PONT DE NEMOURS & CO. ET AL.

No. 55.   Argued February 20–21, 1961.—Decided May 22, 1961.

*John F. Davis* argued the cause for the United States. With him on the briefs were former *Solicitor General*

*Rankin, Solicitor General Cox, Acting Assistant Attorney General Bicks, Acting Assistant Attorney General Kirkpatrick, Philip Elman, Charles H. Weston* and *Bill G. Andrews.*

*Hugh B. Cox* argued the cause for E. I. du Pont de Nemours & Co., appellee. With him on the brief were *John Lord O'Brian, Charles A. Horsky, Daniel M. Gribbon, Nestor S. Foley* and *Alvin Friedman.*

*Robert L. Stern* argued the cause for General Motors Corp., appellee. With him on the brief were *Leo F. Tierney, Bryson P. Burnham, Henry M. Hogan* and *Robert A. Nitschke.*

*Wilkie Bushby* argued the cause for Christiana Securities Co. et al., appellees. With him on the brief was *Philip C. Scott.*

Briefs of *amici curiae,* urging affirmance, were filed by *Andrew J. Dallstream* and *Manuel E. Cowen* for du Pont and General Motors shareholders, respectively, and by *Joseph M. Proskauer* and *Harold H. Levin* for Clara M. Blum et al.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The United States filed this action in 1949 in the District Court for the Northern District of Illinois. The complaint alleged that the ownership and use by appellee E. I. du Pont de Nemours & Co. of approximately 23 percent of the voting common stock of appellee General Motors Corporation was a violation of sections 1 and 2 of the Sherman Act, 15 U. S. C. §§ 1, 2, and of section 7 of the Clayton Act, 15 U. S. C. § 18. After trial, the District Court dismissed the complaint. 126 F. Supp. 235 (D. C. N. D. Ill. 1954). On the Government's appeal, we reversed. We held that du Pont's acquisition of the 23 percent of General Motors stock had led to the insulation from free competition of

most of the General Motors market in automobile finishes and fabrics, with the resultant likelihood, at the time of suit, of the creation of a monopoly of a line of commerce, and, accordingly, that du Pont had violated § 7 of the Clayton Act. *United States* v. *E. I. du Pont de Nemours & Co.*, 353 U. S. 586 (1957).[1] We did not, however, determine what equitable relief was necessary in the public interest. Instead, we observed that "[t]he District Courts . . . are clothed 'with large discretion to model their judgments to fit the exigencies of the particular case.' *International Salt Co.* v. *United States*, 332 U. S. 392, 400–401," and remanded the cause to the District Court "for a determination, after further hearing, of the equitable relief necessary and appropriate in the public interest to eliminate the effects of the acquisition offensive to the statute." 353 U. S., at 607–608.

On remand, the District Court invited the Government to submit a plan of relief which in its opinion would be effective to remedy the violation. The court also appointed two *amici curiae* to represent the interests of General Motors and du Pont shareholders, respectively, most of whom, of course, had not been made parties to this litigation. The Government submitted a proposed plan of relief. That plan included diverse forms of injunctive relief, but its principal feature was a require- ment that within 10 years the du Pont company com- pletely divest itself of its approximately 63 million General Motors shares. The Government proposed that about two-thirds of these shares be distributed *pro rata* to the generality of du Pont shareholders in the form of dividends over the 10-year period. The other one-third of du Pont's General Motors holdings—stock which

---

[1] Since a holding that the Clayton Act had been violated sufficed to dispose of the case, we did not decide whether du Pont had also violated the Sherman Act. See 353 U. S., at 588, note 5.

would have gone to appellées Christiana Securities Company and Delaware Realty and Investment Company, holding companies long identified with the du Pont family itself—were to go to a court-appointed trustee, to be sold gradually over the same 10-year period. Du Pont objected that the Government's plan of complete divestiture entailed harsh income-tax consequences for du Pont stockholders and, if adopted, would also threaten seriously to depress the market value of du Pont and General Motors stock. Du Pont therefore proposed its own plan designed to avoid these results. The salient feature of its plan was substitution for the Government's proposed complete divestiture of a plan for partial divestiture in the form of a so-called "pass through" of voting rights, whereby du Pont would retain all attributes of ownership of the General Motors stock, including the right to receive dividends and a share of assets on liquidation, except the right to vote. The vote was to be "passed through" to du Pont's shareholders proportionally to their holdings of du Pont's own shares, except that Christiana and Delaware would "pass through" the votes allocable to them to their own shareholders. The *amici curiae* also proposed plans of compliance, substantially equivalent to the du Pont plan. The *amicus* representing the generality of du Pont shareholders proposed in addition a program of so-called "take-downs," by which du Pont shareholders would be allowed to exchange their du Pont common stock for a new class of du Pont "Special Common," plus their *pro rata* share of du Pont-held General Motors common stock.

The District Court held several weeks of hearings. The evidence taken at the hearings, largely of expert witnesses, fills some 3,000 pages in the record before us, and, together with the numerous financial charts and tables received as exhibits, bears mainly not on the competition-restoring effect of the several proposals, but

rather on which proposal would have the more, and which the less, serious tax and market consequences for the owners of the du Pont and General Motors stock. The District Court concluded that although ". . . there is no need for the Court to resolve the conflict in the evidence as to how severe those consequences would be[, t]he Court is persuaded beyond any doubt that a judgment of the kind proposed by the Government would have very serious adverse consequences." 177 F. Supp. 1, 42 (D. C. N. D. Ill. 1959). The court for this reason rejected the Government's plan and adopted the du Pont proposal, with some significant modifications. The "pass through" of voting rights, for example, was so limited that neither Christiana, Delaware, nor their officers and directors (plus resident members of the latter's families), should be able to vote any of the du Pont-held General Motors stock; General Motors shares allocable to the two companies or to their officers and directors, or to the officers and directors of du Pont, or to resident members of the families of the officers and directors of the several companies, were to be sterilized, voted by no one. Du Pont, Christiana, and Delaware were forbidden to acquire any additional General Motors stock. Du Pont and General Motors might not have any preferential or discriminatory trade relations or contracts with each other. No officer or director of du Pont, Christiana, or Delaware might also serve as an officer or director of General Motors. Nor might du Pont, Christiana, or Delaware nominate or propose any person to be a General Motors officer or director, or seek in any way to influence the choice of persons to fill those posts. The Government objected that without a provision ordering complete divestiture the decree, although otherwise satisfactory, was inadequate to redress the antitrust violation, and filed its appeal here under § 2 of the Expediting Act, 15 U. S. C. § 29. We noted probable jurisdiction. 362 U. S. 986 (1960).

A threshold question—and one which, although subsidiary, is most important—concerns the scope of our review of the District Court's discharge of the duty delegated by our judgment to formulate a decree. In our former opinion we alluded to the "large discretion" of the District Courts in matters of remedy in antitrust cases. Many opinions of the Court in such cases observe that "[t]he formulation of decrees is largely left to the discretion of the trial court . . . ," *Maryland & Virginia Milk Producers Assn.* v. *United States,* 362 U. S. 458, 473 (1960); "[i]n framing relief in antitrust cases, a range of discretion rests with the trial judge," *Besser Mfg. Co.* v. *United States,* 343 U. S. 444, 449 (1952); "[t]he determination of the scope of the decree to accomplish its purpose is peculiarly the responsibility of the trial court," *United States* v. *United States Gypsum Co.,* 340 U. S. 76, 89 (1950); "[t]he framing of decrees should take place in the District rather than in Appellate Courts," *International Salt Co.* v. *United States,* 332 U. S. 392, 400 (1947). The Court has on occasion said that decrees will be upheld in the absence of a showing of an abuse of discretion. See, *e. g., Maryland & Virginia Milk Producers Assn.* v. *United States, supra,* p. 473; *United States* v. *W. T. Grant Co.,* 345 U. S. 629, 634 (1953); *Timken Roller Bearing Co.* v. *United States,* 341 U. S. 593 (1951);[2] *United States* v. *National Lead Co.,* 332 U. S. 319, 334–335 (1947); *United States* v. *Crescent Amusement Co.,* 323 U. S. 173, 185 (1944).[3] These

---

[2] In this case, however, a majority of the Court substantially modified the District Court's decree, in spite of expressions of deference written into the principal opinion.

[3] In *Crescent Amusement* the Court relied in part on the fact that the district judge had initially found the violation of law. This circumstance was said to enhance the deference owed to the district judge's determination of the measures appropriate to eliminate the violation, 323 U. S., at 185. This factor is not present in the case before us.

expressions are not, however, to be understood to imply a narrow review here of the remedies fashioned by the District Courts in antitrust cases. On the contrary, our practice, particularly in cases of a direct appeal from the decree of a single judge, is to examine the District Court's action closely to satisfy ourselves that the relief is effective to redress the antitrust violation proved. "The relief granted by a trial court in an antitrust case and brought here on direct appeal, thus by-passing the usual appellate review, has always had the most careful scrutiny of this Court. Though the records are usually most voluminous and their review exceedingly burdensome, we have painstakingly undertaken it to make certain that justice has been done." *International Boxing Club* v. *United States,* 358 U. S. 242, 253 (1959); see also *id.,* at 263 (dissenting opinion). We have made it clear that a decree formulated by a District Court is not "subject only to reversal for gross abuse. Rather we have felt an obligation to intervene in this most significant phase of the case when we concluded there were inappropriate provisions in the decree." *United States* v. *United States Gypsum Co., supra,* p. 89.

In sum, we assign to the District Courts the responsibility *initially* to fashion the remedy, but recognize that while we accord due regard and respect to the conclusion of the District Court, we have a duty ourselves to be sure that a decree is fashioned which will effectively redress proved violations of the antitrust laws. The proper disposition of antitrust cases is obviously of great public importance, and their remedial phase, more often than not, is crucial. For the suit has been a futile exercise if the Government proves a violation but fails to secure a remedy adequate to redress it. "A public interest served by such civil suits is that they effectively pry open to competition a market that has been closed by defendants' illegal restraints. If this decree accomplishes

less than that, the Government has won a lawsuit and lost a cause." *International Salt Co. v. United States, supra,* p. 401.

Our practice reflects the situation created by the congressional authorization, under § 2 of the Expediting Act,[4] of a direct appeal to this Court from the judgment of relief fashioned by a single judge. Congress has deliberately taken away the shield of intermediate appellate review by a Court of Appeals, and left with us alone the responsibility of affording the parties a review of his determination.[5] This circumstance imposes a special burden upon us, for, as Mr. Justice Roberts said for the Court, ". . . it is unthinkable that Congress has entrusted the enforcement of a statute of such far-reach-

---

[4] 32 Stat. 823, as amended, 15 U. S. C. § 29. The purpose of this statute was to expedite determination of antitrust cases by allowing the Attorney General to obtain a special Circuit (now District) Court of several judges by filing a certificate of public importance under § 1 of the Act, 32 Stat. 823, as amended, 15 U. S. C. § 28 (no such certificate was filed in this case), and by providing for direct appeal to the Supreme Court from the decree of the trial court, whether composed of one or several judges, such appeal to be within this Court's obligatory jurisdiction. Congress was moved by the "far-reaching importance of the cases arising under [the] antitrust laws . . . ." 36 Cong. Rec. 1679 (remarks of Senator Fairbanks, Feb. 4, 1903). See also H. R. Rep. No. 3020, 57th Cong., 2d Sess. 2 (1903).

[5] In one case this elimination of the normal review by the Court of Appeals almost prevented there being any review of the District Court at all. See *United States v. Aluminum Co. of America,* 320 U. S. 708 (1943) (noting the absence of a quorum in this Court to hear an Expediting Act appeal from a District Court). But Congress acted to keep such an important matter from going unreviewed, see H. R. Rep. No. 1317, 78th Cong., 2d Sess. (1944), and enacted a special statute, 58 Stat. 272, 15 U. S. C. § 29, pursuant to which this Court immediately certified the case to a Circuit Court of Appeals, 322 U. S. 716 (1944), which proceeded to decide the appeal. 148 F. 2d 416 (C. A. 2d Cir. 1945). See also *United States v. United States District Court,* 334 U. S. 258 (1948).

ing importance to the judgment of a single judge, without review of the relief granted or denied by him," *Hartford-Empire Co.* v. *United States,* 324 U. S. 570, 571 (1945), clarifying 323 U. S. 386 (1945).

These principles alone would require our close examination of the District Court's action. But the necessity for that examination in this case further appears in the light of additional considerations. First of all, the decree was fashioned in obedience to the judgment which we sent down to the District Court after our reversal of that court's dismissal of the Government's complaint. We have plenary power to determine whether our judgment was scrupulously and fully carried out. Chief Justice Taft, speaking for the Court, said in *Continental Ins. Co.* v. *United States,* 259 U. S. 156, 166 (1922), "We delegated to the District Court the duty of formulating a decree in compliance with the principles announced in our judgment of reversal, and that gives us plenary power where the compliance has been attempted and the decree in any proper way is brought to our attention to see that it follows our opinion." [6] Secondly, the record is concerned mainly with the alleged adverse tax and market effects of the Government's proposal for complete divestiture. But the primary focus of inquiry, as we shall show, is upon the question of the relief required effectively to eliminate the tendency of the acquisition condemned by § 7. For it will be remembered that the violation was not *actual* monopoly but only a *tendency* towards

---

[6] Government counsel at the trial advised the District Court that he had no authority to suggest modes of divestiture different from the plan presented by the Government to the District Court. Appellees suggest that the Government is thus estopped from urging other modes of divestiture on this appeal. But plainly, under the rule of *Continental Insurance,* no stipulation by the Government could circumscribe this Court's power to see that its mandate is carried out.

monopoly. The required relief therefore is a remedy which reasonably assures the elimination of that tendency. Does partial divestiture in the form of the "pass through" of voting power, together with the ancillary relief, give an effective remedy, or is complete divestiture necessary to assure effective relief? Little in the record or in the District Court's opinion is concerned with that crucial question. The findings of possible harsh consequences relied upon to justify rejection of complete divestiture are thus hardly of material assistance in reaching judgment on the central issue. If our examination persuades us that the remedy decreed leaves the public interest in the elimination of the tendency inadequately protected, we should be derelict in our duty if we did not correct the error.

Before we examine the adequacy of the relief allowed by the District Court, it is appropriate to review some general considerations concerning that most drastic, but most effective, of antitrust remedies—divestiture. The key to the whole question of an antitrust remedy is of course the discovery of measures effective to restore competition. Courts are not authorized in civil proceedings to punish antitrust violators, and relief must not be punitive. But courts are authorized, indeed required, to decree relief effective to redress the violations, whatever the adverse effect of such a decree on private interests. Divestiture is itself an equitable remedy designed to protect the public interest. In *United States* v. *Crescent Amusement Co., supra,* where we sustained divestiture provisions against an attack similar to that successfully made below, we said, at p. 189: "It is said that these provisions are inequitable and harsh income tax wise, that they exceed any reasonable requirement for the prevention of future violations, and that they are therefore punitive. . . . Those who violate the Act may not reap

the benefits of their violations and avoid an undoing of their unlawful project on the plea of hardship or inconvenience." [7]

If the Court concludes that other measures will not be effective to redress a violation, and that complete divestiture is a necessary element of effective relief, the Government cannot be denied the latter remedy because economic hardship, however severe, may result. Economic hardship can influence choice only as among two or more effective remedies. If the remedy chosen is not effective, it will not be saved because an effective remedy would entail harsh consequences. This proposition is not novel; it is deeply rooted in antitrust law and has never been successfully challenged.[8] The criteria were announced in one of the earliest cases. In *United States* v. *American Tobacco Co.,* 221 U. S. 106, 185 (1911), we said:

> "In considering the subject . . . three dominant influences must guide our action: 1. The duty of giving complete and efficacious effect to the prohibitions of the statute; 2, the accomplishing of this result with as little injury as possible to the interest

---

[7] Bills were introduced in the Eighty-sixth Congress to ameliorate the income-tax consequences of gain on disposition of stock pursuant to orders enforcing the antitrust laws. See Hearings on S. 200 before the Senate Committee on Finance, 86th Cong., 1st Sess. (1959); Hearings on H. R. 8126 before the House Committee on Ways and Means, 86th Cong., 1st Sess. (1959); H. R. Rep. No. 1128, 86th Cong., 1st Sess. (1959).

[8] See, *e. g., United States* v. *Crescent Amusement Co.,* 323 U. S. 173, 189 (1944); *United States* v. *Corn Products Refining Co.,* 234 F. 964, 1018 (D. C. S. D. N. Y. 1916), appeal dismissed on motion of appellant, 249 U. S. 621 (1919); *United States* v. *E. I. du Pont de Nemours & Co.,* 188 F. 127, 153 (C. C. D. Del. 1911), modified, 273 F. 869 (D. C. D. Del. 1921); *In re Crown Zellerbach Corp.,* CCH Trade Reg. Rep. 1957–1958 ¶ 26,923, at p. 36,462 (F. T. C. 1958).

> of the general public; and, 3, a proper regard for the vast interests of private property which may have become vested in many persons as a result of the acquisition either by way of stock ownership or otherwise of interests in the stock or securities of the combination without any guilty knowledge or intent in any way to become actors or participants in the wrongs which we find to have inspired and dominated the combination from the beginning."

The Court concluded in that case that, despite the alleged hardship which would be involved, only dissolution of the combination would be effective, and therefore ordered dissolution. Plainly, if the relief is not effective, there is no occasion to consider the third criterion.

Thus, in this case, the adverse tax and market consequences which the District Court found would be concomitants of complete divestiture cannot save the remedy of partial divestiture through the "pass through" of voting rights if, though less harsh, partial divestiture is not an effective remedy. We do not think that the "pass through" is an effective remedy and believe that the Government is entitled to a decree directing complete divestiture.

It cannot be gainsaid that complete divestiture is peculiarly appropriate in cases of stock acquisitions which violate § 7.[9] That statute is specific and "narrowly

---

[9] We reject the Government's argument that the Federal Trade Commission and other administrative agencies charged with the duty of enforcing the statute are required by § 11 of the Clayton Act to order divestiture whenever they find a violation of § 7, and that therefore courts acting under § 15 must give the same relief. Even if the administrative agencies were so limited, a question which we do not decide, Congress would not be deemed to have restricted the broad remedial powers of courts of equity without explicit language doing so in terms, or some other strong indication of intent. *Hecht Co.* v. *Bowles,* 321 U. S. 321, 329 (1944).

directed," [10] *Standard Oil Co.* v. *United States,* 337 U. S. 293, 312 (1949), and it outlaws a particular form of economic control—stock acquisitions which tend to create a monopoly of any line of commerce. The very words of § 7 suggest that an undoing of the acquisition is a natural remedy. Divestiture or dissolution has traditionally been the remedy for Sherman Act violations whose heart is intercorporate combination and control,[11] and it is rea-

---

[10] The words were actually used of § 3 of the Clayton Act, but they are equally applicable to § 7.

[11] See *Northern Securities Co.* v. *United States,* 193 U. S. 197 (1904); *Standard Oil Co.* v. *United States,* 221 U. S. 1 (1911); *United States* v. *American Tobacco Co.,* 221 U. S. 106 (1911); *United States* v. *Union Pacific R. Co.,* 226 U. S. 61 (1912), modified, 226 U. S. 470 (1913); *United States* v. *Reading Co.,* 226 U. S. 324 (1912), modified, 228 U. S. 158 (1913); *United States* v. *Reading Co.,* 253 U. S. 26 (1920), modified after remand, *Continental Ins. Co.* v. *United States,* 259 U. S. 156 (1922); *United States* v. *Lehigh Valley R. Co.,* 254 U. S. 255 (1920); *United States* v. *Southern Pacific Co.,* 259 U. S. 214 (1922); *United States* v. *Crescent Amusement Co.,* 323 U. S. 173 (1944); *Hartford-Empire Co.* v. *United States,* 323 U. S. 386 (1945), clarified, 324 U. S. 570 (1945); *United States* v. *National Lead Co.,* 332 U. S. 319 (1947); *Schine Chain Theatres, Inc.,* v. *United States,* 334 U. S. 110 (1948); *United States* v. *Paramount Pictures, Inc.,* 334 U. S. 131 (1948); *Besser Mfg. Co.* v. *United States,* 343 U. S. 444 (1952); *International Boxing Club* v. *United States,* 358 U. S. 242 (1959); *United States* v. *E. I. du Pont de Nemours & Co.,* 188 F. 127 (C. C. D. Del. 1911), modified, 273 F. 869 (D. C. D. Del. 1921); *United States* v. *Lake Shore & M. S. R. Co.,* 203 F. 295 (D. C. S. D. Ohio 1912), modified, 281 F. 1007 (D. C. S. D. Ohio 1916); *United States* v. *International Harvester Co.,* 214 F. 987 (D. C. D. Minn. 1914), modification denied, 10 F. 2d 827 (D. C. D. Minn. 1926), aff'd, 274 U. S. 693 (1927); *United States* v. *Eastman Kodak Co.,* 226 F. 62 (D. C. W. D. N. Y. 1915), decree entered, 230 F. 522 (D. C. W. D. N. Y. 1916), appeal dismissed on motion of appellant, 255 U. S. 578 (1921); *United States* v. *Corn Products Refining Co.,* 234 F. 964 (D. C. S. D. N. Y. 1916), appeal dismissed on motion of appellant,

sonable to think immediately of the same remedy when § 7 of the Clayton Act, which particularizes the Sherman Act standard of illegality, is involved. Of the very few litigated [12] § 7 cases which have been reported, most decreed divestiture as a matter of course.[13] Divestiture

---

249 U. S. 621 (1919); *United States* v. *Minnesota Mining & Mfg. Co.*, 92 F. Supp. 947 (D. C. D. Mass. 1950), modified, 96 F. Supp. 356 (D. C. D. Mass. 1951); *United States* v. *Imperial Chemical Indus., Ltd.*, 100 F. Supp. 504 (D. C. S. D. N. Y. 1951), decree entered, 105 F. Supp. 215 (D. C. S. D. N. Y. 1952).

In many of these cases the courts referred to "dissolution" or "divorcement" instead of "divestiture." These terms have traditionally been treated as to a large degree interchangeable, and we so regard them. See Hale and Hale, Market Power: Size and Shape Under the Sherman Act 370 (1958); Adams, Dissolution, Divorcement, Divestiture: the Pyrrhic Victories of Antitrust, 27 Ind. L. J. 1, note 1 (1951).

[12] Appellees rely on several Clayton Act consent decrees granting relief short of divestiture, but the circumstances surrounding such negotiated agreements are so different that they cannot be persuasively cited in a litigation context.

[13] See, *e. g., Maryland & Virginia Milk Producers Assn.* v. *United States*, 362 U. S. 458 (1960); *Aluminum Co. of America* v. *Federal Trade Comm'n*, 284 F. 401 (C. A. 3d Cir. 1922), cert. denied, 261 U. S. 616 (1923), modification denied, 299 F. 361 (C. A. 3d Cir. 1924). *United States* v. *New England Fish Exchange*, 258 F. 732 (D. C. D. Mass. 1919), modification denied, 292 F. 511 (D. C. D. Mass. 1923), on which appellees place great reliance, is not a clear exception. It is true that defendants there were allowed to retain the assets (not the stock) of one of the eight corporations whose stock they had acquired in violation of § 7. But probably acquisition of only one of those corporations' stock would not have been illegal. The only clear exception in the courts is *American Crystal Sugar Co.* v. *Cuban-American Sugar Co.*, 152 F. Supp. 387 (D. C. S. D. N. Y. 1957), aff'd on the defendant's appeal, 259 F. 2d 524 (C. A. 2d Cir. 1958). But the authority of that case is somewhat diminished by the fact that it was brought not by the Government but by a private plaintiff, and by the absence of any discussion in the opinion of the issue of divestiture *vel non*. See 152 F. Supp., at 400–401 and note 16.

has been called the most important of antitrust remedies.[14] It is simple, relatively easy to administer, and sure. It should always be in the forefront of a court's mind when a violation of § 7 has been found.

The divestiture only of voting rights does not seem to us to be a remedy adequate to promise elimination of the tendency of du Pont's acquisition offensive to § 7. Under the decree, two-thirds of du Pont's holdings of General Motors stock will be voted by du Pont shareholders—upwards of 40 million shares. Common sense tells us that under this arrangement there can be little assurance of the dissolution of the intercorporate community of interest which we found to violate the law. The du Pont shareholders will *ipso facto* also be General Motors voters. It will be in their interest to vote in such a way as to induce General Motors to favor du Pont, the very result which we found illegal on the first appeal. It may be true, as appellees insist, that these shareholders will not exercise as much influence on General Motors as did du Pont when it held and voted the shares as a block. And it is true that there is no showing in this record that the du Pont shareholders will combine to vote together, or that their information about General Motors' activities will be detailed enough to enable them to vote their shares as strategically as du Pont itself has done. But these arguments misconceive the nature of this proceeding. The burden is not on the Government to show *de novo* that a "pass through" of the General Motors vote, like du Pont's ownership of General Motors stock, would violate § 7. *United States* v. *Aluminum Co. of America*, 91 F. Supp. 333, 346 (D. C. S. D. N. Y. 1950). It need only appear that the decree entered leaves a substantial likelihood that the tendency towards monopoly of the acquisition condemned by § 7 has not

---

[14] See Hale and Hale, *op cit., supra,* note 11, at 370.

been satisfactorily eliminated. We are not required to assume, contrary to all human experience, that du Pont's shareholders will not vote in their own self-interest. Moreover, the General Motors management, which over the years has become accustomed to du Pont's special relationship,[15] would know that the relationship continues to a substantial degree, and might well act accordingly. The same is true of du Pont's competitors. They might not try so vigorously to break du Pont's hold on General Motors' business, as if complete divestiture were ordered. And finally, the influence of the du Pont company itself would not be completely dissipated. For under the decree du Pont would have the power to sell its General Motors shares; the District Court expressly held that "[t]here would be nothing in the decree to prevent such dispositions." 177 F. Supp., at 41. Such a sale would presumably restore the vote separated from the sold stock while du Pont owned it. This power to transfer the vote could conceivably be used to induce General Motors to favor du Pont products. In sum, the "pass through" of the vote does not promise elimination of the violation offensive to § 7. What was said of the Sherman Act in *United States* v. *Union Pacific R. Co.*, 226 U. S. 470, 477 (1913), applies here: "So far as is consistent with this purpose a court of equity dealing with such combinations should conserve the property interests involved, but never in such wise as to sacrifice the object and purpose of the statute. The decree of the courts must be faithfully executed and no form of dissolution be permitted that in substance or effect amounts to restoring the

---

[15] For the significance of such long habit, see *North American Co.* v. *Securities & Exchange Comm'n,* 327 U. S. 686, 693 (1946); *United States* v. *Imperial Chemical Indus., Ltd.,* 105 F. Supp. 215, 236–237 (D. C. S. D. N. Y. 1952); Douglas, Democracy and Finance 33 (1940).

combination which it was the purpose of the decree to terminate."

Du Pont replies, *inter alia,* that it would be willing for all of its General Motors stock to be disenfranchised, if that would satisfy the requirement for effective relief. This suggestion, not presented to the District Court, is distinctly an afterthought. If the suggestion is disenfranchisement only while du Pont retains the stock, it would not avoid the hazards inherent in du Pont's power to transfer the vote. If the suggestion is permanent loss of the vote, it would create a large and permanent separation of corporate ownership from control, which would not only run directly counter to accepted principles of corporate democracy, but also reduce substantially the number of voting General Motors shares, thereby making it easier for the owner of a block of shares far below an absolute majority to obtain working control, perhaps creating new antitrust problems for both General Motors and the Department of Justice in the future. And finally, we should be reluctant to effect such a drastic change in General Motors' capital structure, established under state corporation law.

Appellees argue further that the injunctive provisions of the decree supplementary to the "pass through" of voting rights adequately remove any objections to the effectiveness of the "pass through." Du Pont is enjoined, for example, from in any way influencing the choice of General Motors' officers and directors, and from entering into any preferential trade relations with General Motors. And, under ¶ IX of the decree, the Government may reapply in the future should this injunctive relief prove inadequate. Presumably this provision could be used to prevent the exercise of the power to transfer the vote. But the public interest should not in this case be required to depend upon the often cumbersome and

time-consuming injunctive remedy. Should a violation of one of the prohibitions be thought to occur, the Government would have the burden of initiating contempt proceedings and of proving by a preponderance of the evidence that a violation had indeed been committed.[16] Such a remedy would, judging from the history of this litigation, take years to obtain. Moreover, an injunction can hardly be detailed enough to cover in advance all the many fashions in which improper influence might manifest itself. And the policing of an injunction would probably involve the courts and the Government in regulation of private affairs more deeply than the administration of a simple order of divestiture.[17] We think the public is entitled to the surer, cleaner remedy of divestiture. The same result would follow even if we were in doubt. For it is well settled that once the Government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor.[18]

We therefore direct complete divestiture. Since the District Court's decree was framed around the provision directing only partial divestiture, and since General Motors, Christiana, and Delaware acquiesced in its provisions only on that basis, we shall not pass upon the provisions for ancillary relief but shall vacate the decree

---

[16] *United States* v. *Corn Products Refining Co.*, 234 F. 964, 1018 (D. C. S. D. N. Y. 1916), appeal dismissed on motion of appellant, 249 U. S. 621 (1919); 12 Ala. L. Rev. 214, 220–221 (1959); Note, 56 Col. L. Rev. 420, 430 (1956) ("contempt citations are a poor method of restoring competition . . ."); Berge, Some Problems in the Enforcement of the Antitrust Laws, 38 Mich. L. Rev. 462, 469 (1940).

[17] See Hale and Hale, *op. cit., supra,* note 11, at 379.

[18] *United States* v. *Bausch & Lomb Optical Co.*, 321 U. S. 707, 726 (1944); *Local 167, International Brotherhood of Teamsters* v. *United States*, 291 U. S. 293, 299 (1934). Cf. *William R. Warner & Co.* v. *Eli Lilly & Co.*, 265 U. S. 526, 532 (1924) (same principle applied to private litigation).

in its entirety except as to the provisions of ¶ VI enjoining du Pont itself from exercising voting rights in respect of its General Motors stock. In this way the District Court will be free to fashion a new decree consistent with this opinion at a new hearing at which all parties may be heard. General Motors, Christiana, and Delaware will thus be able to renew, for the District Court's decision in the first instance, any objections they may have to the power of the Court to grant relief against them.

We believe, however, that this already protracted litigation should be concluded as soon as possible. To that end we direct the District Court on receipt of our judgment to enter an order requiring du Pont to file within 60 days a proposed judgment providing for complete divestiture of its General Motors stock, to commence within 90 days, and to be completed within not to exceed 10 years, of the effective date of the District Court's judgment, and requiring the Government to file, within 30 days after service upon it of du Pont's proposed judgment, either proposed specific amendments to such du Pont judgment or a proposed alternate judgment of divestiture. The District Court shall give precedence to this cause on its calendar.

The judgment of the District Court, except to the extent ¶ VI is affirmed, is vacated and remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE CLARK and MR. JUSTICE HARLAN took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE WHITTAKER and MR. JUSTICE STEWART join, dissenting.

In *United States* v. *E. I. du Pont de Nemours & Co.*, 353 U. S. 586, the Court held that the acquisition and continued ownership by E. I. du Pont de Nemours & Co.

of twenty-three percent of the stock of the General Motors Corporation constituted a violation of § 7 of the Clayton Act.[1] The question now before us is the adequacy of the terms of the enforcement of that judgment by the United States District Court for the Northern District of Illinois, 177 F. Supp. 1. In order to determine whether the district judge satisfactorily discharged the duties assigned him, it is necessary to be clear about these underlying elements of the question for decision: (1) What did this Court hold and say in finding that du Pont had violated § 7? (2) What considerations guided the district judge in fashioning his decree? (3) What principles has this Court laid down for the formulation of decrees by District Courts, particularly under the antitrust laws, and for review of those decrees here?

## I.

As the Court described it, the "primary issue" in the Government's suit against du Pont, General Motors, and related parties was "whether du Pont's commanding position as General Motors' supplier of automotive finishes and fabrics was achieved on competitive merit alone, or because its acquisition of the General Motors' stock, and the consequent close intercompany relationship, led to the insulation of most of the General Motors' market from free competition, with the resultant likelihood, at the time of suit, of the creation of a monopoly of a line of commerce." 353 U. S., at 588–589. The question was asked in the context of these facts.

The transaction out of which the case arose was the acquisition by du Pont, during the period 1917–1919, of

---

[1] 38 Stat. 731, 15 U. S. C. (1946 ed.) § 18. The suit was brought prior to the enactment in 1950 of amendments to the Act which, by their terms, are inapplicable to previous acquisitions. 64 Stat. 1125, 15 U. S. C. § 18.

a twenty-three percent stock interest in General Motors. That "colossus of the giant automobile industry" absorbed "upwards of two-fifths of the total sales of automotive vehicles in the Nation" over the period from 1938 to 1955. In 1955 it ranked first in sales and second in assets among all United States industrial corporations. Purchases of automotive fabrics and finishes by General Motors from du Pont ran into millions of dollars annually in the years immediately preceding the institution of the Government's suit in 1949. Du Pont supplied sixty-seven percent of General Motors' requirements for finishes in 1946 and sixty-eight percent in 1947. The figures for fabrics supplied to General Motors by du Pont in those years are fifty-two and three-tenths percent and thirty-eight and five-tenths percent respectively.

Du Pont's "commanding position as a General Motors supplier" was not achieved until after its acquisition of a substantial fraction of General Motors' stock. At the time of this purchase, du Pont was actively seeking markets for its nitrocellulose, artificial leather, celluloid, rubber-coated goods, and paints and varnishes used by automobile manufacturers. Leading du Pont executives in 1917 and 1918 indicated that the acquisition of General Motors stock was due in part to a belief that it would secure for du Pont an important market for its automotive products.

> "This background of the acquisition, particularly the plain implications of the contemporaneous documents, destroys any basis for a conclusion that the purchase was made 'solely for investment.' Moreover, immediately after the acquisition, du Pont's influence growing out of it was brought to bear within General Motors to achieve primacy for du Pont as General Motors' supplier of automotive fabrics and finishes." 353 U. S., at 602.

A former du Pont official became a General Motors vice president and set about maximizing du Pont's share of the General Motors market. Lines of communications were established between the two companies and several du Pont products were actively promoted. Within a few years various du Pont manufactured items were filling the entire requirements of from four to seven of General Motors' eight operating divisions. The Fisher Body division, long controlled by the Fisher brothers under a voting trust even though General Motors owned a majority of its stock, followed an independent course for many years, but by 1947 and 1948 "resistance had collapsed" and its purchases from du Pont "compared favorably" with purchases by other General Motors divisions. Competitors came to receive higher percentages of General Motors business in later years, but it is "likely" that this trend stemmed "at least in part" from the needs of General Motors outstripping du Pont's capacity.

> "The fact that sticks out in this voluminous record is that the bulk of du Pont's production has always supplied the largest part of the requirements of the one customer in the automobile industry connected to du Pont by a stock interest. The inference is overwhelming that du Pont's commanding position was promoted by its stock interest and was not gained solely on competitive merit." 353 U. S., at 605.

This Court agreed with the trial court "that considerations of price, quality and service were not overlooked by either du Pont or General Motors." 353 U. S., at 606. However, it determined that neither this factor, nor "the fact that all concerned in high executive posts in both companies acted honorably and fairly, each in the honest conviction that his actions were in the best interests of his own company and without any design to overreach anyone, including du Pont's competitors," 353 U. S., at

607, outweighed the Government's claim for relief. This claim, as submitted to the District Court and dismissed by it, 126 F. Supp. 235, alleged violation not only of § 7 of the Clayton Act, but also of §§ 1 and 2 of the Sherman Act.[2] The latter provisions proscribe any contract, combination, or conspiracy in restraint of interstate or foreign trade, and monopolization of, or attempts, combinations, or conspiracies to monopolize, such trade. However, this Court put to one side without consideration the Government's appeal from the dismissal of its Sherman Act allegations.[3] It rested its decision solely on § 7, which reads in pertinent part:

> "[N]o corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation engaged also in commerce, where the effect of such acquisition may be to substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce.
>
> . . . . .
>
> "This section shall not apply to corporations purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition. . . ."

The purpose of this provision was thus explained in the Court's opinion:

> "Section 7 is designed to arrest in its incipiency not only the substantial lessening of competition from the acquisition by one corporation of the whole or

---

[2] 26 Stat. 209, as amended, 50 Stat. 693, 15 U. S. C. §§ 1, 2.

[3] See 353 U. S., at 588, n. 5.

any part of the stock of a competing corporation, but also to arrest in their incipiency restraints or monopolies in a relevant market which, as a reasonable probability, appear at the time of suit likely to result from the acquisition by one corporation of all or any part of the stock of any other corporation. The section is violated whether or not actual restraints or monopolies, or the substantial lessening of competition, have occurred or are intended. . . ." 353 U. S., at 589.

Thus, a finding of conspiracy to restrain trade or attempt to monopolize was excluded from the Court's decision. Indeed, as already noted, the Court proceeded on the assumption that the executives involved in the dealings between du Pont and General Motors acted "honorably and fairly" and exercised their business judgment only to serve what they deemed the best interests of their own companies. This, however, did not bar finding that du Pont had become pre-eminent as a supplier of automotive fabrics and finishes to General Motors; that these products constituted a "line of commerce" within the meaning of the Clayton Act; that General Motors' share of the market for these products was substantial; and that competition for this share of the market was endangered by the financial relationship between the two concerns:

"The statutory policy of fostering free competition is obviously furthered when no supplier has an advantage over his competitors from an acquisition of his customer's stock likely to have the effects condemned by the statute. We repeat, that the test of a violation of § 7 is whether, at the time of suit, there is a reasonable probability that the acquisition is likely to result in the condemned restraints. The conclusion upon this record is inescapable that such

likelihood was proved as to this acquisition. . . ." 353 U. S., at 607.

On the basis of the findings which led to this conclusion, the Court remanded the case to the District Court to determine the appropriate relief. The sole guidance given the Court for discharging the task committed to it was this:

> "The judgment must therefore be reversed and the cause remanded to the District Court for a determination, after further hearing, of the equitable relief necessary and appropriate in the public interest to eliminate the effects of the acquisition offensive to the statute. The District Courts, in the framing of equitable decrees, are clothed 'with large discretion to model their judgments to fit the exigencies of the particular case.' *International Salt Co.* v. *United States,* 332 U. S. 392, 400–401." 353 U. S., at 607–608.

This brings us to the course of the proceedings in the District Court.

## II.

This Court's judgment was filed in the District Court on July 18, 1957. The first pretrial conference—held to appoint *amici curiae* to represent the interests of the stockholders of du Pont and General Motors and to consider the procedure to be followed in the subsequent hearings—took place on September 25, 1957. At the outset, the Government's spokesman explained that counsel for the Government and for du Pont had already held preliminary discussions with a view to arriving at a relief plan that both sides could recommend to the court. Du Pont, he said, had proposed disenfranchisement of its General Motors stock along with other restrictions on the du Pont-General Motors relationship. The Government, deeming these suggestions inadequate, had urged

that any judgment include divestiture of du Pont's shares of General Motors. Counsel for the Government invited du Pont's views on this proposal before recommending a specific program, but stated that if the court desired, or if counsel for du Pont thought further discussion would not be profitable, the Government was prepared to submit a plan within thirty days.

Counsel for du Pont indicated a preference for the submission of detailed plans by both sides at an early date. No previous antitrust case, he said, had involved interests of such magnitude or presented such complex problems of relief. The submission of detailed plans would place the issues before the court more readily than would discussion of divestiture or disenfranchisement in the abstract. The Court adopted this procedure with an appropriate time schedule for carrying it out.

The Government submitted its proposed decree on October 25, 1957. The plan called for divestiture by du Pont of its 63,000,000 shares of General Motors stock by equal annual distributions to its stockholders, as a dividend, over a period of ten years. Christiana Securities Company and Delaware Realty & Investment Company, major stockholders in du Pont, and the stockholders of Delaware were dealt with specially by provisions requiring the annual sale by a trustee, again over a ten-year period, of du Pont's General Motors stock allocable to them, as well as any General Motors stock which Christiana and Delaware owned outright. If, in the trustee's judgment, "reasonable market conditions" did not prevail during any given year, he was to be allowed to petition the court for an extension of time within the ten-year period. In addition, the right to vote the General Motors stock held by du Pont was to be vested in du Pont's stockholders, other than Christiana and Delaware and the stockholders of Delaware; du Pont, Christiana, and Delaware were to be enjoined from acquiring

stock in or exercising control over General Motors; du Pont, Christiana, and Delaware were to be prohibited to have any director or officer in common with General Motors, and vice versa; and General Motors and du Pont were to be ordered to terminate any agreement that provided for the purchase by General Motors of any specified percentage of its requirements of any du Pont manufactured product, or for the grant of exclusive patent rights, or for a grant by General Motors to du Pont of a preferential right to make or sell any chemical discovery of General Motors, or for the maintenance of any joint commercial enterprise by the two companies.

On motion of the *amici curiae*, the court directed that a ruling be obtained from the Commissioner of Internal Revenue as to the federal income tax consequences of the Government's plan. On May 9, 1958, the Commissioner announced his rulings. The annual dividends paid to du Pont stockholders in shares of General Motors stock would be taxable as ordinary income to the extent of du Pont's earnings and profits. The measure, for federal income tax purposes, of the dividend to individual stockholders would be the fair market value of the shares at the time of each annual distribution. In the case of taxpaying corporate stockholders, the measure would be the lesser of the fair market value of the shares or du Pont's tax basis for them, which is approximately $2.09 per share. The forced sale of the General Motors stock owned by or allocable to Christiana, Delaware, and the stockholders of Delaware, and deposited with the trustee, would result in a tax to those parties at the capital gains rate.

Du Pont's counterproposal was filed on May 14, 1958. Under its plan du Pont would retain its General Motors shares but be required to pass on to its stockholders the right to vote those shares. Christiana and Delaware would, in turn, be required to pass on the voting rights to the General Motors shares allocable to them to their own

stockholders. Du Pont would be enjoined from having as a director, officer, or employee anyone who was simultaneously an officer or employee of General Motors, and no director, officer, or employee of du Pont could serve as a director of General Motors without court approval. Du Pont would be denied the right to acquire any additional General Motors stock except through General Motors' distributions of stock or subscription rights to its stockholders.

On June 6, 1958, General Motors submitted its objections to the Government's proposal. It argued, *inter alia*, that a divestiture order would severely depress the market value of the stock of both General Motors and du Pont, with consequent serious loss and hardship to hundreds of thousands of innocent investors, among them thousands of small trusts and charitable institutions; that there would be a similar decline in the market values of other automotive and chemical stocks, with similar losses to the stockholders of those companies; that the tremendous volume of General Motors stock hanging over the market for ten years would hamper the efforts of General Motors and other automobile manufacturers to raise equity capital; and that all this would have a serious adverse effect on the entire stock market and on general business activity. General Motors comprehensively contended that the Government plan would not be "in the public interest" as required by the mandate of this Court.

The decrees proposed by the *amici curiae* were filed in August of 1958. These plans, like du Pont's, contained provisions for passing the vote on du Pont's General Motors shares on to the ultimate stockholders of du Pont, Christiana, and Delaware, except that officers and directors of the three companies, their spouses, and other people living in their households, as well as other speci-

fied persons, were to be totally disenfranchised. Both plans also prohibited common directors, officers, or employees between du Pont, Christiana, and Delaware, on the one hand, and General Motors on the other. Further, both plans placed restrictions on trade relations between du Pont and General Motors. *Amicus* Dallstream, representing the du Pont stockholders, proposed in addition a program termed a "takedown," by which du Pont would create a new class of stock, "du Pont Special Common," which would have no rights in du Pont's General Motors stock and which du Pont stockholders could obtain, along with their allocable portion of the General Motors shares owned by du Pont, at times suitable to them, in exchange for their present du Pont common. This proposal would have different, and in several respects more favorable, tax consequences than those of the Government's plan.[4]

In a memorandum filed on September 26, 1958, the Government, on the assumption that divestiture was required under the Clayton Act, suggested various ways in which its decree might be modified to ameliorate its harsh tax consequences. The Government stated that it would have no objections to the modifications discussed in the memorandum but it did not submit amendments to its original proposal.

On the same day, the Government filed a motion for a preliminary injunction, seeking to restrain du Pont, Christiana, and Delaware from exercising their voting rights in General Motors stock, to prevent du Pont, Christiana, and Delaware from having any director, officer, or employee in common with General Motors or nominating any such person to serve in General Motors,

---

[4] For a discussion of *amicus* Dallstream's recommendations, see the opinion of the District Court, 177 F. Supp., at 9–10.

and to prohibit further acquisitions of General Motors stock by the three corporations. The Government urged that since all parties were in substantial agreement on these measures as the minimum appropriate relief, the court should adopt them without delay. The court denied the motion on November 3, 1958, on the ground that the Government had failed to show a likelihood of irreparable injury in the absence of immediate relief and that, with final determination of the case not far distant, it would be undesirable to begin deciding issues piecemeal at that late date.

After further preliminaries which need not be recounted, the trial of the issues on the appropriate relief commenced on February 16, 1959, and continued to a conclusion on April 9, 1959. The Government presented its evidence on twelve hearing days; the defendants and *amici* also presented evidence on twelve days; and the Government took four more hearing days for the presentation of rebuttal evidence. Briefs were filed and the case was submitted to the court in June 1959. The court's decision was announced on October 2, 1959.

The printed record of the proceedings below covers 3,340 pages. Of this, trial of the issues pertaining to the terms of the decree fills 2,380 pages. An additional 543 pages contain exhibits. In the course of the trial twenty-nine witnesses were called by the Government and thirty-two by the defendants and *amici*. The printed exhibits number 193 submitted by the Government, thirty-two by du Pont, thirty by General Motors, nine by Christiana and Delaware, and one by *amicus* Dallstream. The bulk of this mass of evidence bore principally upon disputes over the market and tax consequences of divestiture of du Pont's General Motors stock and upon the requirement of resort to this remedy for the effective enforcement of § 7.

On occasion the Government objected to the attention that was being focused on the details of its proposed decree. The Government insisted that its ultimate aim was not to further a specific plan but to obtain any reasonable order of divestiture. However, late in the trial the Government indicated that its original divestiture proposal stood before the court unamended in any detail.

"Mr. Reycraft (chief counsel for the Government): . . . .

.  .  .  .  .

"I might also add that it is rather an obvious thought that the judgment which we did file was approved by not only the Assistant Attorney General but the Attorney General, and that *while I am authorized here to represent the Government, I have no authority to change the decisions they make.*

"The Court: *It is my understanding then that you are standing on the decree that you proposed before this hearing started?*

"Mr. Reycraft: *That is right, sir.*

.  .  .  .  .

"Mr. Cox (counsel for du Pont): . . . .

". . . I understand Mr. Reycraft's position now to be that he stands on the judgment that was filed. But if the Government should come in on its brief with a brand new proposal sometime, may it please the Court, we may find ourselves in a position where we will have to come into Court and ask for some kind of an opportunity to have a look at that.

"The Court: That will depend entirely on the extent or the character of the deviation from the original proposal.

"Mr. Cox: I would assume that would be true.

"The Court: *From what Mr. Reycraft has said, I am assuming that that is the decree, with probably minor changes.*

"Mr. Reycraft: *I have nothing further, your Honor.*"⁵  (Emphasis added throughout.)

Thus it appears that the Government stood on its original proposal, rather than on alternative suggestions.

And so one comes to consider how the court dealt with the issues presented by the parties.

### III.

After disposing of two preliminary questions—ruling in favor of the amenability of General Motors, Christiana, and Delaware, as parties not condemned as violators of § 7, to the enforcing power of the court, and against the amenability to direct enforcement of holders of both du Pont and Delaware stock who were not parties to the suit—the court thus defined the central issue before it:

"Under the mandate of the Supreme Court it is the responsibility of this Court to frame a judgment which will eliminate the effects of du Pont's acquisition of stock of General Motors which are offensive to the statute.  The effect of the acquisition which the Supreme Court found to be offensive to the statute was the 'reasonable probability' that the acquisition might result in restraint or monopolization of the market for automotive fabrics and finishes.  353 U. S. 586, 595, 607, 77 S. Ct. 872, 1 L. Ed. 2d 1057.  Accordingly, the problem before this Court is one of devising a judgment that will effectively guard against the probability of restraint or monopolization which the Supreme Court found to exist."  177 F. Supp., at 12–13.

---

⁵ Transcript of Proceedings, March 31, 1959.

In discharging its duty under this mandate, particularly since relevant circumstances might offer a choice between effective alternatives, the court deemed it appropriate not to exclude from consideration the vast multiform interests at stake—both the hundreds of thousands of truly innocent stockholders and the bearing on the national economy of the nature of the disposition of du Pont's General Motors holdings.

"This does not mean that the private interests of the stockholders can outweigh the public interest in a judgment that will effectively dissipate the effects of the acquisition found to be unlawful. But it does mean that in the opinion of this Court the primary public purpose should be achieved so far as possible without inflicting unnecessary injury upon innocent stockholders in the various corporations involved. The purpose of the judgment should be remedial and not punitive. Hartford-Empire Co. v. United States, 323 U. S. 386, 409, 65 S. Ct. 373, 89 L. Ed. 322; United States v. National Lead Co., 332 U. S. 319, 67 S. Ct. 1634, 91 L. Ed. 2077. No harsh and oppressive consequences should be visited upon the stockholders unless it can be shown on the facts that these results are inescapable if a decree is to be framed that will comply with the mandate of the Supreme Court. The cases leave no doubt that these are considerations which the Court should weigh in the framing of its final judgment. United States v. American Tobacco Co., 221 U. S. 106, 185, 31 S. Ct. 632, 55 L. Ed. 663. Compare Timken Roller Bearing Co. v. United States, 341 U. S. 593, 604, 71 S. Ct. 971, 95 L. Ed. 1199." 177 F. Supp., at 13–14.

The Government's first major contention—that by the terms of the Clayton Act the court had no choice but

to order total divestiture—was rejected on the basis of an analysis of the statute and this Court's reaffirmation of the "large discretion" possessed by the District Courts "to model their judgments to fit the exigencies of the particular case." The court proceeded to a consideration of the evidence introduced by the parties. The first subject was the tax impact of the Government's proposed decree. Extensive expert evidence (much of which was derived from a statistical survey found by the court to have been soundly and objectively conducted) indicated that individual stockholders of du Pont would pay income taxes at a rate of fifty percent to sixty percent under the Government's plan, and that the taxes payable by such persons could amount to $1,000,000,000 if the value of the General Motors shares were $50 per share, and approximately $770,000,000 if $40 per share. The capital gains tax on the sale of the General Motors stock allocable to Christiana and Delaware would be perhaps as much as $200,000,000. The court determined that variations of the Government's plan would also result in vast tax levies. It found, for example, that if a single distribution were employed to dispose of the 63,000,000 General Motors shares, at an assumed market value of $45 per share the total tax cost would be $588,044,000.

A second economic consequence of the Government's divestiture scheme would be its impact on the market value of the securities involved. The Government relied on three types of evidence to show that its plan would have little influence on the market prices of General Motors and du Pont stock. The first type was expert testimony that there was a regular flow of investment money coming into the market. However, upon detailed review of the testimony of a dozen witnesses, the court concluded that "there was no convincing evidence in this category that any substantial portion of this invest-

ment money would be directed to buying General Motors stock at the true value of the stock, if the Government decree were in effect." 177 F. Supp., at 22.

The Government's second type of evidence relating to the market consequences of its decree was the statistical testimony of academic and professional analysts. The court noted that it was shown no charts or statistics relating to a situation "remotely approaching" the forced sale of 2,000,000 shares of General Motors stock each year for ten years, attended by additional sales of both General Motors and du Pont stock for tax and other purposes. Further, it found that one Government expert admitted he would defer to the judgment of investment bankers in the matter of the price for which the General Motors stock could be sold; another testified that in the past an increase in stock supply of twenty percent had been associated with price declines of between ten and fifteen percent; the testimony of another Government witness was based on inadequately drawn statistical tables, and his demeanor on the witness stand deprived his evidence of credibility; a fourth witness' opinions had no foundation in factual evidence.

The Government's third type of evidence related to securities offerings in the recent past. The court determined that the circumstances of these offerings—i. e., their background, magnitude, timing, and duration—made them dissimilar to a divestiture of du Pont's interest in General Motors. In any event most of these offerings did have a depressing effect on the market value of the stock involved. None of this evidence, the court found, gave assurance that the Government proposal would not cause serious loss on the sale of General Motors and du Pont stock during the divestiture period.

The defendants countered the Government's case with a variety of evidence. Two experienced underwriters testified that the Government's ten-year divesti-

ture plan would result in a decline in the value of General Motors stock of from twenty percent to thirty percent; that heavy tax sales of du Pont would lower its price at least twenty-five percent; that distribution of General Motors stock in lieu of cash dividends would be even worse from this standpoint; that even an extension of the divestiture period to twenty years would not prevent declines in the neighborhood of fifteen percent; that a further loss estimated at from $1.50 to $2 per share sold in underwriting expense would be incurred by Christiana and Delaware; and, finally, that the trustee could never make the sales during the divestiture period anyway, since he could not realize a price, in the words of the Government's proposed final judgment, "sufficiently high to reflect the fair value and true worth of the stock."

Several trust management executives testified that because of the tax consequences of the Government's decree and the difficulties of allocating equitably the General Motors shares received as dividends by the trusts, they, and presumably others in their position throughout the country, would be forced to make mass sales of du Pont stock. Executives of several insurance companies and an investment trust company predicted declines in the value of General Motors stock and expressed an intention to buy it for their concerns only at considerably reduced prices. Many witnesses concurred in the view that the Government's decree would render future financing by General Motors highly uneconomic and very difficult to accomplish.

The court then appraised the evidence bearing on possible voting control of General Motors, under a decree of less than total divestiture, by corporations or individuals affiliated with du Pont. It determined that the Government's broadest grouping—individuals who were stockholders of Delaware, additional individuals named du Pont, and certain corporations in which both groups

(sixty-five persons in all) own stock or on whose boards they sit—would, under the du Pont plan's "pass-through" of voting rights, aggregate the vote of about eight percent of the total vote of General Motors. It was unclear to the court either that this combination had a reasonable basis in fact or that, even if it did represent a cohesive block of votes, it was a large enough block to exercise any real control over General Motors. However, the court deemed it unnecessary to resolve these questions, since it intended to frame a decree to guarantee that concerted action by these stockholders would be precluded.

On the basis of its appraisal of the evidence, the court reached its essential conclusions. The first question was what provision to make with respect to du Pont's 63,000,000 shares of General Motors. It determined that a careful and detailed plan for a "pass-through" of the votes of these shares to du Pont's stockholders and an injunction to prevent du Pont and General Motors from sharing common officers, directors, and employees were necessary. The court then considered whether title to the stock, stripped of these vital incidents of ownership, must also be taken from du Pont, "in order to remove and to guard against the probability of restraint or monopolization of trade which was the consequence the Supreme Court found to be offensive to the statute." 177 F. Supp., at 40. "There is no evidence," it concluded, "on which the Court could make such a finding." 177 F. Supp., at 40.

> "In essence, therefore, what would be left in du Pont would be the most sterile kind of an investment. The Court notes in this connection that Section 7 of the Clayton Act expressly excludes from its operation 'corporations purchasing such stock solely for investment and not using the same by voting or otherwise' to bring about anti-competitive effects. There would thus appear to be a recognition on the

part of Congress that the holding of stock does not in all instances carry with it the power to bring about consequences offensive to the statute. The Court recognizes that the Supreme Court has held that in the past du Pont has not held its stock in General Motors solely for investment. This Court is of the opinion, however, that the divestiture and ancillary injunctive provisions referred to hereafter will be effective to assure that hereafter General Motors stock will be held by du Pont solely for investment.

.        .        .        .        .

"In the circumstances, therefore, the Court finds that there is nothing in the record made in the hearing on relief or in the record in the trial in chief which would support, even by inference, the conclusion that du Pont's possession of the bare legal title to General Motors stock, stripped of its right to vote and of its right to representation on the Board of General Motors, would create any possibility that the stock would have any influence on the practices and policies of General Motors or could be used in any way that would be inconsistent with the mandate of the Supreme Court." 177 F. Supp., at 41.

What was on the other side of the ledger? The evidence indicated that divestiture of legal title would visit upon thousands of innocent investors adverse tax and market consequences, always severe even if varying in detail depending on the variation of the Government's plan. The court concluded that any plan for divestiture of legal title to du Pont's interest in General Motors would either impair the value of the property interests involved or impose severe tax consequences on du Pont's stockholders. Moreover, any plan that produced as a by-product the accumulation of vast amounts of cash by du Pont would have the undesirable result

of enhancing greatly du Pont's economic power and position. All this led the court to hold that total divestiture, while unnecessary to remove the anticompetitive consequences of du Pont's ownership of the General Motors stock, would impose unfair injury on the stockholders of those companies.

The court dealt with the Government's two objections to its result. The fear that block voting of the passed-through votes on the General Motors shares by investors who were related by blood or business interest would leave control of General Motors in the hands of du Pont's close associates was met by precluding the stockholders of Christiana and Delaware, as well as other specified persons, from voting their allocable shares of du Pont's General Motors stock. The objection that retention by du Pont of any financial stake in General Motors, even on behalf of its stockholders, would provide incentive to intercorporate favoritism between the two, while deemed merely a "naked suggestion," was answered by providing specific relief against preferential trade relations between du Pont and General Motors. In light of the proof and of these precautionary prohibitions, the court concluded that to order divestiture of du Pont's title to the General Motors stock would "constitute a serious abuse of discretion." 177 F. Supp., at 49.[6]

---

[6] A summary of the detailed provisions of the decree carrying out the direction and purposes of the court's opinion follows.

Du Pont, Christiana, and Delaware were enjoined from acquiring additional General Motors stock except as stock or rights might be distributed to them as stockholders by General Motors.

Du Pont, Christiana, and Delaware, on the one hand, and General Motors, on the other, were prohibited to have common officers, directors, or employees. The former three were also restrained from nominating any person to be an officer or director of General Motors.

Du Pont and General Motors were compelled to terminate, for as long as du Pont, Christiana, or Delaware own any General Motors stock, any agreement between them which (1) requires General

## IV.

The questions presented by this appeal must be considered in the setting of the proceedings, summarized above, that led to the District Court's conclusions in formulating its decree. Since the Court rejects the Gov-

---

Motors to purchase from du Pont a specified percentage of its requirements of any product (with certain time provisos), or (2) grants to either concern exclusive patent rights, or grants to du Pont preferential rights to make or sell any chemical discovery of General Motors.

Du Pont, Christiana, and Delaware were restrained, for the same period, from entering into any joint business venture with General Motors and from knowingly holding stock in any business enterprise in which General Motors holds stock. The same restrictions were applied to General Motors.

Du Pont was enjoined, again for the stock-holding period, from dealing with General Motors with respect to du Pont products on terms more favorable than those on which it is willing to deal with General Motors' competitors. The same restriction was placed upon General Motors in its dealings with du Pont.

Du Pont, Christiana, and Delaware, and their directors and officers, and the members of the families of their directors and officers who reside in the same household with them, were enjoined from exercising their voting rights in General Motors stock owned by them or allocable to them under the decree, and from attempting to influence anyone voting General Motors stock.

The vote on the General Motors shares owned by du Pont was ordered "passed through" to the stockholders of du Pont (subject to the prohibitions of the preceding paragraph), and the notification and proxy machinery necessary to effectuate this provision was outlined. Provision was made for the appointment of a monitor of these voting procedures.

A procedure was established whereby du Pont and Christiana might sell or otherwise dispose of their General Motors stock.

Two separate provisions preserved the right of any party to apply to the court for modification of the decree in the event of a change of circumstances (such as the advent of legislative tax relief) and for further orders necessary for carrying out the judgment.

Du Pont, Christiana, and Delaware were directed to obtain from

ernment's claim that total divestiture is statutorily required upon a finding of a violation of § 7 of the Clayton Act, I need say no more about it.

If a District Court is not subject to any statutory requirement to order divestiture in a § 7 case, is it left without guidance or direction in fashioning an appropriate decree as a court of equity? Of course not. There is a body of authority, both procedural and substantive, by which it is to be guided. It is, however, well to remember that the wise admonition that general principles do not decide concrete cases has sharp applicability to equity decrees. Any apparently applicable policy or rule, abstractly stated, must be related to the specific circumstances of a particular case in which it is invoked and applied. Care must be taken to consider phrases used in relation to the particular facts of the cases relied on.

One principle has comprehensive application. It is that courts of equity, as this Court advised the District Court in remanding the case to it to fashion the appropriate relief, "are clothed 'with large discretion to model their judgments to fit the exigencies of the particular case.' " 353 U. S., at 607–608. This is a commonplace,[7] but one of compelling importance. To forget it is to forget equity's special function and historic significance. The transcendence of this doctrine derives from the recog-

their officers and directors, and their families, written consents to be bound by the voting restrictions of the judgment.

For the purpose of securing compliance with the judgment, the Department of Justice was authorized to conduct reasonable inspections of the records and interviews with the employees of du Pont, Christiana, and Delaware and to apply to the court for similar privileges as to General Motors upon a showing of good cause.

[7] See, e. g., United States v. Crescent Amusement Co., 323 U. S. 173, 185; International Salt Co. v. United States, 332 U. S. 392, 400–401; Besser Mfg. Co. v. United States, 343 U. S. 444, 449–450; International Boxing Club v. United States, 358 U. S. 242, 253.

nition that without it the effort to dispense equal justice under law would all too often be frustrated. The landmark sentences of *Hecht Co. v. Bowles,* 321 U. S. 321, 329–330, express the principles that must guide the chancellor:

> "We are dealing here with the requirements of equity practice with a background of several hundred years of history. . . . The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. . . ."

If, indeed, equity's characteristic flexibility is deeply rooted in history, the administration of justice makes greater demands upon it now than ever before. As business transactions become increasingly complex, they multiply and complicate the issues presented to courts even in litigation of ordinary dimensions. How much more is this true of a suit of the magnitude and reach of the one before us, with inevitable impact far beyond the interests of the immediate parties. In such a case we need to be specially mindful that the purpose of equity jurisdiction is to adapt familiar principles of law to intricate, elusive, and unfamiliar facts. As one member of this Court recently put it: "Equity decrees are not like the packaged goods this machine age produces. They are uniform only in that they seek to do equity in a given case." *United Steelworkers of America v. United States,* 361 U. S. 39, 62, 71 (dissenting opinion).[8]

---

[8] In addition, see, for example, McClintock, Equity (2d ed. 1948), § 30:

"A court of equity may frame its decree so as to protect to the greatest extent possible the conflicting interests of the parties; to

The District Court was duty bound to exercise discretion—which means to weigh contending considerations and conflicting evidence as a matter of judgment—in framing a decree to meet the needs of the case. It could not escape exercising discretion—that is, exercising its judgment within an area of allowable choice—which this Court committed to it. Discretion precludes whimsy or caprice. Discretion means the judicial discretion of a court of equity. Where precedent or judicial tradition has established limitations on the chancellor's range of choice, he must respect them. What limitations confined the court below? Consideration of the relevant authorities on the formulation of antitrust decrees becomes necessary.

First, what was open to consideration in the District Court? Its overriding concern had to be for the protection of the public interest. It was its duty to hear all the evidence bearing on that question and in any conflict with private interests decisively to resolve doubts in favor of the general welfare. The account of the District Court's procedures, and of the considerations on which it reached its reflective conclusions, in Parts II and III of this opinion establishes, I submit, that it fully conformed to this essential requirement. Although it considered the Government's case on the likelihood of block voting of the votes of the General Motors shares passed through to Delaware and Christiana of doubtful

---

accomplish this it may require the performance of conditions, may experiment to determine how best to accomplish its purpose, and may use either the negative or the positive form of decree."

Pomeroy, Equity Jurisprudence (5th ed. 1941), § 109:
"Equitable remedies . . . are distinguished by their flexibility, their unlimited variety, their adaptability to circumstances, and the natural rules which govern their use. There is in fact no limit to their variety and application; the court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties."

strength, it sterilized those shares to prevent their being voted at all. Again, although it found no proof in the record to support the Government's "naked suggestion" concerning the probability of future preferential trade relations between General Motors and du Pont, it constructed a set of prohibitions against such dealing between the two enterprises. As already noted, the court fashioned its decree in deference to its conception of its "primary duty" to devise a judgment "that will effectively guard against the probability of restraint or monopolization which the Supreme Court found to exist." 177 F. Supp., at 13.

Did the District Court fail in its duty because it deemed relevant for consideration as one factor in striking the balance involved in its conclusion the consequences of divestiture to thousands upon thousands of blameless stockholders and other so-called private interests? The decisions of this Court gave full warrant to the District Court that it did not exceed its discretionary powers in doing so. The weighty words of *United States* v. *American Tobacco Co.*, 221 U. S. 106, 185, are apposite:

> "In considering the subject . . . three dominant influences must guide our action: 1. The duty of giving complete and efficacious effect to the prohibitions of the statute; 2, the accomplishing of this result with as little injury as possible to the interest of the general public; and, 3, a proper regard for the vast interests of private property which may have become vested in many persons as a result of the acquisition either by way of stock ownership or otherwise of interests in the stock or securities of the combination without any guilty knowledge or intent in any way to become actors or participants in the wrongs which we find to have inspired and dominated the combination from the beginning. . . ."

And in *Standard Oil Co.* v. *United States,* 221 U. S. 1, 78, the Court admonished that "the fact must not be

overlooked that injury to the public by the prevention of an undue restraint on, or the monopolization of trade or commerce is the foundation upon which the prohibitions of the statute rest, and moreover that one of the fundamental purposes of the statute is to protect, not to destroy, rights of property." The importance of these considerations was reiterated in *Continental Ins. Co.* v. *United States,* 259 U. S. 156, with the Government actively championing their propriety, and suggesting that " 'it seemed wise not to amputate any more than was necessary to secure the great policy of the Sherman law.' " 259 U. S., at 169. In *United States* v. *United Shoe Machinery Co.,* 247 U. S. 32, 46, the Court labeled dissolution a remedy "extreme, even in its mildest demands" and counseled "If there be need for this the difficulties of achievement should not deter; but the difficulties may admonish against the need . . . ." This holds for divestiture.[9]

This Court's decisions leave no doubt that it was proper for the District Court to attend to the likelihood of danger to the public welfare that might arise from the serious adverse market consequences of divestiture and to the likelihood of extensive loss to innocent investors through both market decline and tax levy. It is apparent that the Department of Justice recognized the relevance of the tax impact. In a statement on proposed legislation to alleviate the tax burden of divestiture decrees, Robert A. Bicks, then Acting Assistant Attorney General in charge of the Antitrust Division of the Justice Department, said:

> "Bear in mind, the 1890 Sherman and the 1914 Clayton Acts, the basic antitrust statutes, became law before the income tax was a reality. And the land-

---

[9] See also *United States* v. *Terminal R. Assn.,* 224 U. S. 383; *United States* v. *American Can Co.,* 234 F. 1019; *United States* v. *Great Lakes Towing Co.,* 208 F. 733, 217 F. 656.

362

mark antitrust cases—dissolving illegal trusts and monopolies via divestiture—were largely a product of an era marked by no income tax or much lower tax rates. Indeed, there is real basis for concluding that some bench-mark antitrust divestiture cases . . . might well not have been decreed had today's tax rates prevailed." Bicks, Statement on H. R. 7361 and H. R. 8126 before the House Committee on Ways and Means, July 20, 1959, 4 Antitrust Bulletin 557 (1959).

It is obvious from the context of these remarks that their immediate objective was to smooth the way toward obtaining divestiture in this very case.[10]

In a case such as *du Pont,* in which the challenged transaction occurred approximately thirty years prior to the initiation of suit, the force of these considerations is greatly enhanced. The relationship between General Motors and du Pont stood uncondemned by the Government through successive administrations throughout that period. This is not remotely to hint any form of estoppel against resort to divestiture as relief for the illegality, however belatedly established, were it otherwise the required means for correction of past misconduct or its future avoidance. I do maintain that, as this Court has recognized, it was altogether proper for the District Court—even incumbent upon it—to take "account of what was done during that time—the many millions of dollars spent, the developments made, and the

---

[10] The Bicks statement itself makes repeated reference to the pending *du Pont* case. See 4 Antitrust Bulletin, at 561, n. 7, 562, n. 8, 567, n. 13. And the Committee. Report and Hearings recur again and again to the serious tax problem engendered by the case. See H. R. Rep. No. 1128, 86th Cong., 1st Sess.; Hearings on H. R. 8126 before the House Committee on Ways and Means, 86th Cong., 1st Sess.; Hearings on S. 200 before the Senate Committee on Finance, 86th Cong., 1st Sess.

enterprises undertaken, the investments by the public that have been invited and are not to be ignored." *United States* v. *United States Steel Corp.,* 251 U. S. 417, 453.

In short, the factors that influenced the District Court were fit considerations for judicial scrutiny. But we still have to inquire what criteria were open to the District Court for appraising the relevant variables and how that court's determinations are to be reviewed by this Court.

The very foundation for judgment in reviewing a District Court's decree in a case like this is the inherent nature of its task in adjudicating claims arising under the antitrust laws. The sweeping generality of the antitrust laws differentiates them from ordinary statutes. "As a charter of freedom," wrote Mr. Chief Justice Hughes for the Court, "the [Sherman] Act has a generality and adaptability comparable to that found to be desirable in constitutional provisions." *Appalachian Coals, Inc.,* v. *United States,* 288 U. S. 344, 359–360. This is no less true of the Clayton Act's prohibition "where the effect . . . may be to substantially lessen competition." Correspondingly broad is the area within which a District Court must move to fit the remedy to the range of the outlawry. Far-reaching responsibility is vested in the court charged with fashioning a decree and the decree it fashions must be judged on review in light of this responsibility.

> "In the anti-trust field the courts have been accorded, by common consent, an authority they have in no other branch of enacted law. . . . They would not have been given, or allowed to keep, such authority in the anti-trust field, and they would not so freely have altered from time to time the interpretation of its substantive provisions, if courts were in the habit of proceeding with the surgical ruthlessness that

might commend itself to those seeking absolute assurance that there will be workable competition, and to those aiming at immediate realization of the social, political, and economic advantages of dispersal of power." *United States* v. *United Shoe Machinery Corp.*, 110 F. Supp. 295, 348 (a decision affirmed by this Court without opinion, 347 U. S. 521).

Partly on the basis of these views, the Attorney General's National Committee to Study the Antitrust Laws recommended that divestiture "not be decreed as a penalty," that it "not be invoked where less drastic remedies will accomplish the purpose of the litigation," and that possible disruption of industry and markets as well as effect on the public, investors, customers, and employees be taken into account. Report of the Attorney General's National Committee to Study the Antitrust Laws (1955), pp. 355–356. This statement fairly reflects the views of this Court, to the effect that a decree must not "impose penalties in the guise of preventing future violations," *Hartford-Empire Co.* v. *United States*, 323 U. S. 386, 409; that the least harsh of available measures should be adopted when the Court is satisfied that they will be effective, *e. g., Timken Roller Bearing Co.* v. *United States*, 341 U. S. 593, 603 (concurring opinion); and that injunctive relief may well be an adequate sanction against continued wrongdoing, *id.*, at 604 (concurring opinion), and *Standard Oil Co.* v. *United States*, 221 U. S. 1, 77. Add to this that we have recognized a sound basis in reason for distinguishing palpably illegal activity from conduct that was arguably permissible, and for dealing with the latter less severely than the former. See *Federal Trade Comm'n* v. *National Lead Co.*, 352 U. S. 419, 429; *United States* v. *United States Gypsum Co.*, 340 U. S. 76, 89–90.

The principles thus pronounced by this Court were duly heeded by the District Court. The salient feature of its attitude was its disposition to favor the Government's claims on behalf of the public interest. It even rejected the defendants' argument, based on *National Lead* and *Gypsum, supra,*[11] that it should take into account that the question whether the acquisition violated the law was, to say the least, reasonably in doubt, and that therefore no blame should be imputed to the officers and directors of the defendants. "The Court . . . approaches the problem on the assumption that the appropriate relief is that which is necessary to eliminate the effects of the acquisition offensive to the statute, notwithstanding that the acquisition might reasonably have been believed to be permissible when made." 177 F. Supp., at 14.

The Government urges, however, that divestiture is, if not the required relief, at least the normal and ordinary relief in stock acquisition cases. The contention is that, as the safest remedy, *i. e.,* the surest of anticompetitive results, divestiture is, and has been considered to be, the preferred relief for all save a few exceptional cases. Support for this view is drawn from a long line of cases in which divestiture has been decreed. The contention calls for detailed scrutiny.

The objectives of divestiture were thus stated in *Schine Chain Theatres, Inc.,* v. *United States,* 334 U. S. 110, 128–129:

> "Divestiture or dissolution must take account of the present and future conditions in the particular industry as well as past violations. It serves several functions: (1) It puts an end to the combination or conspiracy when that is itself the violation. (2) It

---

[11] And see *United States* v. *United Shoe Machinery Corp.,* 110 F. Supp. 295, 348.

deprives the antitrust defendants of the benefits of their conspiracy. (3) It is designed to break up or render impotent the monopoly power which violates the Act. . . ."[12]

This tripartite formulation summarizes the considerations that have guided this Court's rulings on divestiture. In *Standard Oil Co.* v. *United States,* 221 U. S. 1, the source of modern antitrust law, the defendants were charged with combination and conspiracy to restrain trade in and monopolize interstate and foreign commerce in petroleum products, in violation of §§ 1 and 2 of the Sherman Act. The lower court found both provisions offended by a combination of seven individual defendants and thirty-eight corporate defendants to lodge in the Standard Oil Co. of New Jersey substantial stock ownership of and control over many subsidiary corporations in the petroleum industry and to cause Standard Oil to manage their affairs so as to throttle competition, findings sustained here. Coming to the problem of remedy, while acknowledging that "ordinarily" injunctive relief would be adequate to restrain repetition of the illegal activity, the Court found that the situation presented by the Standard Oil aggrandizement called for stiffer measures: "But in a case like this, where the condition which has been brought about in violation of the statute, *in and of itself,* is not only a continued attempt to monopolize, but also a monopolization, the duty to enforce the statute requires the application of broader and more controlling remedies." 221 U. S., at 77. (Emphasis added.) Recognition of this need—that inter-

---

[12] For a similar statement see *United States* v. *Minnesota Mining & Mfg. Co.,* 96 F. Supp. 356, 357.

"In general the object of the remedies under the anti-trust laws is to prevent the continuance of wrongful conduct, and to deprive the wrongdoers of the fruits of their unlawful conduct, and to prevent the creation anew of restraint forbidden by law. . . ."

corporate connections call for severance when persistence of the relationship in itself would constitute a violation of the antitrust laws—has been steadfastly adhered to. "Dissolution of the combination will be ordered where the creation of the combination is itself the violation." *United States* v. *Crescent Amusement Co.*, 323 U. S. 173, 189. It has been the controlling factor in the majority of the divestiture decrees in the intervening years, since most situations before the Court have similarly demanded this relief.[13]

The second element of the *Schine* rationale—depriving antitrust defendants "of the benefits of their conspiracy"—is equally well established. *United States* v. *Crescent Amusement Co.*, 323 U. S. 173, was a Sherman Act suit in which certain motion picture exhibitors were found to have used their combined buying power to obtain terms more favorable than those received by their independent competitors in licensing films, whereby independents were driven from the field and a monopoly in theater operation developed in many towns. Each corporate exhibitor was required to divest itself of its interest in any other corporate defendant or its affiliates.

"Those who violate the Act may not reap the benefits of their violations and avoid an undoing of their

---

[13] In the *Crescent* case, 323 U. S., at 189, the Court placed in this category *Northern Securities Co.* v. *United States,* 193 U. S. 197; *Standard Oil Co:* v. *United States,* 221 U. S. 1; *United States* v. *American Tobacco Co.,* 221 U. S. 106; *United States* v. *Union Pacific R. Co.,* 226 U. S. 61; *United States* v. *Reading Co.,* 253 U. S. 26; *United States* v. *Lehigh Valley R. Co.,* 254 U. S. 255; and *United States* v. *Southern Pacific Co.,* 259 U. S. 214. Our survey of these cases sustains this classification. To this list may be added *International Boxing Club* v. *United States,* 358 U. S. 242, in which the Court accepted the District Court's finding that " 'The great evil' " in the case " 'was the combination that Wirtz and Norris caused and created by joining up with Madison Square Garden.' " 358 U. S., at 256.

unlawful project on the plea of hardship or inconvenience. That principle is adequate here to justify divestiture of all interest in some of the affiliates since their acquisition was part of the fruits of the conspiracy." 323 U. S., at 189.[14]

The third *Schine* objective of divestiture was "to break up or render impotent the monopoly power which violates the Act." The role of divestiture in meeting this need was spelled out in the *Crescent* case:

"Common control was one of the instruments in bringing about unity of purpose and unity of action and in making the conspiracy effective. If that affiliation continues, there will be tempting opportunity for these exhibitors to continue to act in combination against the independents. The proclivity in the past to use that affiliation for an unlawful end warrants effective assurance that no such opportunity will be available in the future. . . ." 323 U. S., at 189–190.

These, then, are the justifiable bases for compelling divestiture. They explain and define the authorities on which the Government relies. Do they, or any of them, invalidate the District Court's refusal to decree divestiture in the circumstances of this case and justify this Court in overruling that court's exercise of discretion in finding divestiture uncalled for?

The notion that the very existence of an interest by du Pont in the stock of General Motors constitutes a violation of the Act need not detain us. It cannot be questioned that, as the Court's opinion on the merits in this case makes clear, the violation condemned is the effect of the stockholding on competition, not the

---

[14] See additionally, *International Boxing Club* v. *United States*, 358 U. S. 242, 253.

stockholding as such.[15]   To be sure, this illegal tendency to lessen competition may be ended by terminating any intercorporate relationship.   But just as surely the unlawfulness of the tendentious stockholding may be ended by preventing its harmful consequences.

Nor is divestiture required as a means of depriving the defendant of the fruits of its violation.   While du Pont's interest in General Motors might serve as a tool for the accomplishment of antitrust violations, it is certainly not the fruit of any such violation.   The fruit—the benefit—of a violation of § 7 is the unfair competitive position of one corporation through its stock interest in another. Effective termination of this competitive advantage was precisely the design of the elaborate injunctive provisions devised by the District Court.

The final desideratum—vitiating a monopoly power—is not literally applicable to the du Pont situation, since the District Court dismissed the monopoly charge under the Sherman Act and this Court refused to review the dismissal.   353 U. S., at 588, n. 5.   But even if this criterion were carried over into a Clayton Act setting to enforce the desirability of avoiding every potentiality of monopoly power, there is no compulsion to decree divestiture.   Such

---

[15] This construction of the statute had long been settled.   See *International Shoe Co.* v. *Federal Trade Comm'n*, 280 U. S. 291, 297–298.

"Section 7 of the Clayton Act, as its terms and the nature of the remedy prescribed plainly suggest, was intended for the protection of the public against the evils which were supposed to flow from the undue lessening of competition. . . .

"Mere acquisition by one corporation of the stock of a competitor, even though it result in some lessening of competition, is not forbidden; the act deals only with such acquisitions as probably will result in lessening competition to a substantial degree . . . that is to say, to such a degree as will injuriously affect the public. . . ."

argumentative power does not preclude restraints, by injunctive relief, that render it "impotent," to use the language of the *Schine* case. Nor is there in the record before us any basis in fact for the fears that have evoked the application of this principle in previous divestiture cases. There is no finding in this case, as there were in *Crescent* and *Schine,* of a deliberate conspiracy aimed at the destruction of competition. We cannot point in this case, as we have on occasion in the past, to any blatantly anticompetitive scheme. See, *e. g., United States* v. *Reading Co.,* 253 U. S. 26, 59. Instead we have only the finding that "there is a reasonable probability that the acquisition is likely to result in the condemned restraints," 353 U. S., at 607, *i. e.,* to restrain commerce. Moreover, the Court explicitly ruled executive misconduct out of the case—"without any design to overreach anyone, including du Pont's competitors." 353 U. S., at 607.

Even in the *Crescent* case, the Court voiced its concern for the future only by way of support for its conclusion that the District Court's severance of the defendants could not be reversed for abuse of discretion. 323 U. S., at 190. The Court sustained, rather than overturned, the lower court's judgment. To infer that the Court would have found an abuse of discretion had the District Court in *Crescent* limited itself to a decree of injunctive relief is an unwarranted assumption. But the Government in effect draws such an inference for the purpose of this case, even though the facts of du Pont's violation do not faintly resemble the offense of the movie exhibitors in *Crescent.* When the powerful interests of James J. Hill and J. Pierpont Morgan coalesce to place in one controlling parent the stock of the Great Northern and Northern Pacific Railways, *Northern Securities Co.* v. *United States,* 193 U. S. 197; when the Standard Oil Co. or the American Tobacco Co. obtain monopoly positions in their vast industrial empires, see *Standard Oil Co.* v.

*United States,* 221 U. S. 1, and *United States* v. *American Tobacco Co.,* 221 U. S. 106; when the rail carriers controlling the means of transportation of anthracite coal combine to destroy a potential competitor, *United States* v. *Reading Co.,* 226 U. S. 324, the facts demand the major surgery of divestiture—destruction of the offending combinations. But to hold that the treatment of these conscious conspiracies to restrain trade and to achieve monopoly power is compelling precedent for determining the relief necessary and appropriate to remedy the only wrong judicially found by this Court under § 7, is to treat situations flagrantly different as though they were the same. Surely there is merit to the notion of shaping the punishment to fit the crime, even beyond the precincts of the Mikado's palace.

The grounds thus canvassed furnish the relevant considerations for this Court's review of the District Court's decree. The obvious must be restated. We do not sit to draft antitrust decrees *de novo.* This is a court of appeal, not a trial court. We do not see the witnesses, sift the evidence in detail, or appraise the course of extended argument, session after session, day after day. (A review of Part III of this opinion abundantly shows the extent to which the District Court's appraisal of the credibility of witnesses, analysis of expert testimony, and reconciliation of the claims of counsel entered into the painstaking process that led to the court's views on complicated issues and ultimately to the formulation of its decree.) In short, this Court does not partake of the procedure and is not charged with the responsibility demanded of the court entrusted with the task of devising the details of a decree appropriate for the governance of a vastly complicated situation arising out of unique circumstances. By its nature, this Court, as an appellate tribunal, lacks the means—the procedural facilities—to evolve a decree in a case like this. For these reasons this

Court sent this case back to the District Court, quoting in part (353 U. S., at 608), without specific limitation, the comprehensively general guidelines of an earlier case:

"The framing of decrees should take place in the District rather than in Appellate Courts. They are invested with large discretion to model their judgments to fit the exigencies of the particular case." *International Salt Co.* v. *United States,* 332 U. S. 392, 400–401.[16]

To tell a trial judge that he has discretion in certain matters is to tell him that there is a range of choices available to him. It is to tell him that the responsibility is his, and that he will not be reversed except for straying outside the permissible range of choice, *i. e.,* for abuse of discretion. See, *e. g., United States* v. *Crescent Amusement Co.,* 323 U. S. 173, 189; *Timken Roller Bearing Co.* v. *United States,* 341 U. S. 593, 600–601. In sustaining the judgment in *Lorain Journal Co.* v. *United States,* 342 U. S. 143, 156, the Court stated its standard for upholding the trial court's decree as simply that *"The decree is reasonably consistent with the requirements of the case and remains within the control of the court below."* (Emphasis in the original.) Certainly we ought not to reverse the carefully wrought results of a conscientious trial judge without a showing amounting almost to a demonstration that he exceeded the fair limits of judicial choice which this Court explicitly reposed in him.[17]

---

[16] To the same effect, see *Associated Press* v. *United States,* 326 U. S. 1; *Lorain Journal Co.* v. *United States,* 342 U. S. 143; *International Boxing Club* v. *United States,* 358 U. S. 242; *Maryland & Virginia Milk Producers Assn.* v. *United States,* 362 U. S. 458.

[17] The Court should not allow itself to be led to a contrary conclusion by the language of *United States* v. *United States Gypsum Co.,* 340 U. S. 76, or *Hartford-Empire Co.* v. *United States,* 324 U. S. 570. The *Gypsum* case says only that the District Court's

When a district judge has failed to accord parties an adequate hearing or has been otherwise wanting in the administration of fair procedure, there is the best of reasons for this Court to secure for them the full measure of judicial consideration which they are owed but failed to receive. But when, as in this case, the comprehensiveness of the hearing, the full consideration of the issues, both through evidence and argument, the evident diligence and searching competence of the judge—reflected throughout the long hearing—and his care in expounding the reasons for his judgment demonstrate a deep awareness of the duty with which this Court charged him without any restrictions on his task except that he was entrusted "with large discretion," reversal of the lower court's result can be justified only by a showing of patent misconception of

conclusions should not be subject to reversal merely for *gross* abuse of discretion, and that this Court must intervene when the provisions of the decree are "inappropriate." I could not agree more, either with these views or with those expressed in the remarks that formed their preface:

"The determination of the scope of the decree to accomplish its purpose is peculiarly the responsibility of the trial court. Its opportunity to know the record and to appraise the need for prohibitions or affirmative actions normally exceeds that of any reviewing court." 340 U. S., at 89.

In *Hartford-Empire* the opinion of the Court says "it is unthinkable that Congress has entrusted the enforcement of a statute of such far-reaching importance to the judgment of a single judge, without review of the relief granted or denied by him." 324 U. S., at 571. These words, if given the reading they seem most readily to bear, are certainly unobjectionable, for our power to review the antitrust relief determinations of trial judges is not in doubt. If this language is to be read to authorize *de novo* consideration here of all the details of a lower court's decree, then it marks a real aberration in this branch of the law. Whatever respect such a view might once have deserved, it deserves none now, for our recent decisions have uniformly adopted the principle of appellate deference to trial court discretion. See cases cited in notes 7 and 16, *supra*.

governing law or want of conscientious regard for "the exigencies of the particular case." When judged by the relevant decisions and pronouncements of this Court, such legal defects or inadequacies are impressively disproved by this record.

It may be suggested that however faithfully the trial court abided by the other teachings of this Court, it forgot one, namely, "that relief, to be effective, must go beyond the narrow limits of the proven violation." *United States* v. *United States Gypsum Co.,* 340 U. S. 76, 90. See *International Salt Co.* v. *United States,* 332 U. S. 392, 400. This principle is important but it carries no warrant for reversal in this case. It has already been pointed out that the District Court specifically applied this principle in significant provisions of its decree. This Court found a danger of restraint of trade only in the market for automobile fabrics and finishes. The District Court nevertheless extended the injunctive provisions of its decree to all trade relations between du Pont and General Motors, regardless of the products involved. This Court proceeded on the assumption that the officers and directors of the companies had acted honorably and in the best interests of their respective corporations. Yet the District Court, responsive to the Government's urging, though without substantial evidence in the record, chose to sterilize the voting power not only of du Pont's officers and directors, but also of a major block of its large shareholders, the shareholders of Christiana and Delaware. In fact, the District Court exceeded the Government's requests in several substantial respects. This is true with respect to the injunction against cooperative and preferential business practices between du Pont and General Motors,[18] the prohibition against interlocking corporate person-

---

[18] Compare the Government's proposed Article IX with Section V of the final judgment.

nel,[19] and the detail of the retention of jurisdiction and reopening clauses.[20]

Moreover, the principle of extending relief beyond the narrow limits of the violation has an important limiting corollary. The trial court is not authorized to order relief which it is without findings to support. "A full exploration of facts is usually necessary in order properly to draw such a decree." *Associated Press* v. *United States*, 326 U. S. 1, 22. This Court has unhesitatingly reversed remedial action by the lower courts, both for and against the Government, when wanting in supporting findings. See *Hartford-Empire Co.* v. *United States*, 323 U. S. 386, 418; *Schine Chain Theatres, Inc.*, v. *United States*, 334 U. S. 110; *United States* v. *Paramount Pictures*, 334 U. S. 131, 170–174; *Hughes* v. *United States*, 342 U. S. 353, 357–358. But if findings on questions of fact, or mixed questions of law and fact, are essential to the formulation of a decree, it becomes virtually impossible to develop a basis for a divestiture order at this stage on this record. The District Court found that once all of du Pont's ties to General Motors, save its stock interest, were severed the record is barren of justification for an inference of reasonable probability of restraint of trade. Conversely, it found that the tax and market consequences of divestiture would be so onerous that, in the absence of any serious anticompetitive danger, it would have constituted an abuse of discretion to enter such a decree. These conclusions were based in significant measure on the firsthand factual analysis that only a trial judge is in a position to make. For the Court to require divestiture, thereby overturning a trial court judgment

[19] Compare the Government's proposed Article X with Section IV of the final judgment.

[20] Compare the Government's proposed Article XIII with Sections IX and XII of the final judgment.

founded on an appraisal of voluminous conflicting evidence and opinion, is in effect to displace the trial court's function as a fact-finder.

The Government suggests that possibly, in "exceptional" cases, some remedy other than divestiture may suffice, but that this is not the "exceptional" case. If this is not an "exceptional" case, what would be? Is it really tenable to regard this an ordinary, a conventional, a run-of-the-mill case?

Du Pont began to acquire General Motors stock while World War I was still in progress. It owned that stock openly for three decades before this suit was instituted to challenge the validity of the acquisition. During that period the number of General Motors and du Pont stockholders expanded from a few thousand to many hundreds of thousands. The value of the General Motors stock greatly increased. The tax laws were substantially changed. The District Court has fashioned a closely knit network of provisions to prevent preferential dealings between General Motors and du Pont. So certain was it that divestiture would, on the basis of its findings, work great and unjustifiable loss on wholly innocent investors, that it considered a divestiture order beyond its discretionary power. The precedents of this Court to which the District Court could look for guidance in the discharge of its duty permitted, at the least, the inferences (1) that the framing of the decree lay within its discretion, (2) that within the scope of that discretion it was free to consider all relevant consequences, both public and private, of the plans proposed, (3) that it was under no compulsion to order divestiture, (4) that there was ample reason to avoid a harsh remedy if it were to conclude that a less severe one would be effective, (5) that both the facts and the formulated reasoning of prior divestiture cases made them distinguishable from the

du Pont problem, and (6) that unless the District Court abused its discretion by disregarding this Court's guides for its decision, its judgment would stand on review. In the face of all this, it is indeed "exceptional" for this Court to upset the lower court's judgment that its decree met the needs established in the proceeding before it.

The essential appeal of the Government's position lies in its excitation of fear of any intercorporate relationship between two such colossi as du Pont and General Motors. It is easy to calm this fear by a requirement of divestiture. Insofar as the Court yields to that fear, it is strange, indeed, that this was not obvious to the Court when it found the illegality for which it directed the District Court to evolve a corrective remedy. Not a single consideration now advanced by the Court for directing divestiture was not available when the case was originally here. For not one of these considerations is based on evidence elicited at the hearing before the District Court, directed by this Court, for determining the relief. Such a limitation on the discretionary decree-fashioning power, upon full hearing in the District Court, certainly could not have been in this Court's mind when it remitted that function to the District Court, otherwise it would have spoken its mind and not left it all to the "large discretion" of the court. In any event it requires prophetic confidence to conclude that that decree is so obviously inadequate as to require reversal before it can be tried in practice. Neither the record when the case was first here nor the facts adduced at the hearing on molding the decree give warrant for this Court to set aside the trial court's finding on the improbability of future restraint of trade in view of the safeguarding terms of the decree. If the Court were to allow the District Court's maturely considered scheme for protecting the dominant public interest

with less than "surgical ruthlessness" to proceed, time might show that the relief granted by the District Court was well based, and that this Court's willingness to give it a try properly averted reasonably founded fear of serious economic dislocation.

Reversal by way of commanding divestiture is a "judgment from speculation," carrying with it irreversible consequences, whereas the District Court's decree leaves the door open for "judgment from experience," *Tanner* v. *Little,* 240 U. S. 369, 386, under its clauses retaining jurisdiction to modify the judgment in the light of changed circumstances. Resort to such safety valve clauses is an established practice in review of antitrust remedies, for they allow the courts to act on the basis of informed hindsight rather than treacherous conjecture. In *International Salt Co.* v. *United States,* 332 U. S. 392, 401, the Court enunciated this principle in language pertinent here:

> "The District Court has retained jurisdiction, by the terms of its judgment, for the purpose of 'enabling any of the parties . . . to apply to the court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this judgment' and 'for the amendment, modifications or termination of any of the provisions . . . .' We think it would not be good judicial administration to strike paragraph VI from the judgment to meet a hypothetical situation when the District Court has purposely left the way open to remedy any such situations if and when the need arises. The factual basis of the claim for modification should appear in evidentiary form before the District Court rather than in the argumentative form in which it is before us. . . ."

The wisdom of this policy is reflected in many of our decisions.[21]  Why should it not guide the Court's decision in this case?  The Government's presentation boils down to an unsubstantiated assertion that *any* tie between du Pont and General Motors gravely jeopardizes the play of competitive forces.  When we are asked to assume this, we are asked to assume that even after a decree fashioned with the circumspection with which this was, a "reasonable probability" exists that the defendants will, in a wholly undefined way, combine to violate the antitrust laws.  We are asked, in essence, to enter Alice's Wonderland where proof is unnecessary and the governing rule of law is "Sentence first, verdict after."

The District Court here concluded that the relief it devised would dispel all potential restraints upon free competition as effectively as would divestiture, while divestiture was likely to cause serious economic disturbance unwarranted by a need for that remedy.  Neither in its procedures nor in its consideration of the data presented to it did the court fail to discharge the obligations placed upon it by the decisions of this Court and by the only instruction—to exercise "large discretion"—given it by the Court in this case.  In no way did the District Court abuse the discretion entrusted to it.  Its judgment should therefore be affirmed.  .

---

[21] See *Associated Press* v. *United States,* 326 U. S. 1, 22–23; *Timken Roller Bearing Co.* v. *United States,* 341 U. S. 593, 604 (opinion of Mr. Justice Reed); *Lorain Journal Co.* v. *United States,* 342 U. S. 143, 157; *Maryland & Virginia Milk Producers Assn.* v. *United States,* 362 U. S. 458, 473.