## Anthony Estate

*Guy E. Waltman*, for accountant.

*John B. McGurl*, and with him, *Ronald J. Ulmer* and *John T. Pfeiffer*, for life tenant.

*Robert M. Zimmerman*, and with him, *E. Mac Troutman* and *William A. Williams*, for remaindermen.

BOWE, P.J., March 1, 1965.—. . . From the evidence submitted and the record in the matter, we find and decree as follows:

In his last will and testament, Thomas J. Anthony (hereinafter referred to as "testator"), who died on February 26, 1935, bequeathed his residuary estate to the First National Bank and Trust Company of Orwigsburg, in our County of Schuylkill, in trust to pay the income therefrom to his mother, Olivia C. Anthony, and his wife, Sadie Rohrer Anthony, for their respec-

tive lives, with the survivor to take the entire income; upon the death of the survivor to continue the trust and pay the income therefrom to David R. Schall, an uncle, and Mary Drumheller, an aunt, for their lives, including the life of the survivor; and upon the death of all of these life tenants the trust is to be terminated and the fund distributed to the following named cousins: George I. Bickley, Leon S. Drumheller, Vallie Castle, Marian Rhubright, Laura Wonders, Phillip Drumheller, Esther Drumheller, Mary Corson, Elizabeth Drumheller and Ruth Drumheller, in equal shares, and in case any of them shall not then be living, his or her share shall be paid to his or her issue, if any they have; "and in the event that any of the aforesaid cousins should die without leaving issue them surviving, then his or her share or shares shall be paid to the survivor or survivors of the above named cousins."

Three of the four named life tenants were deceased at the time the account was first called for audit, namely, Olivia C. Anthony, David R. Schall and Mary Drumheller. Sadie Rohrer Anthony was then living and the trust continued for her as sole life tenant until her death on April 17, 1964.

A controversy exists in this trust estate, the nature of which is such that the remaindermen must be considered as vitally interested parties who must have due notice and must be parties of record. As to the remaindermen named in the will, four are deceased, two of whom died without issue and the other two leaving issue. All of the remaindermen are listed in the schedule under paragraph 10 of the statement of proposed distribution filed in accordance with our rules of practice and all of these remaindermen are represented by counsel of record.

The first and final account of the executrix of testator's estate was audited by this court and by decree entered October 28, 1935, there was awarded to the

trustee in the will named, for the purposes therein provided, the following personalty, at the valuations stated, as the corpus of the trust created in the will:

| | |
|---|---:|
| 450 shares duPont common stock .... | $42,075.00 |
| 7 shares Atlas Powder Company preferred stock ............... | 768.25 |
| 500 shares Amalgamated Gold Mine stock ............... | 0.00 |
| Pulaski Realty Company stock ..... | 0.00 |
| Cash .......................... | 157.84 |
| | $43,001.09 |

In the same decree of distribution there was awarded to the same trustee $1,298.80 in the form of cash income for use of Olivia C. Anthony and Sadie Rohrer Anthony, life tenants.

The First National Bank and Trust Company of Orwigsburg is now, by merger, the Pennsylvania National Bank and Trust Company of Pottsville, the above-named accountant, and the latter's first account as successor trustee is presently here for audit. In this account, the accountant duly charges itself with the award above referred to. . . .

Another change in the original principal of the trust fund is stated in the account in the form of principal as follows:

| | |
|---|---:|
| August 13, 1962. Received as holder of 1800 shares E. I. duPont & Co. common at market value and holding period as of 7/9/62—900 shares General Motors Corp. Com. ................... | $43,200.00 |
| Deducted from Book Value of 1800 shares E. I. duPont de Nemours & Co. ....................... | 42,075.00 |
| Profit ........................ | $ 1,125.00 |

The accountant then adds this "profit" of $1,125 to $43,001.09 and thereby shows gross principal of $44,126.09 from which $52.50 in the form of credits claimed is deducted, leaving a balance of principal in the amount of $44,073.59, which latter total is stated as consisting of:

| | |
|---|---:|
| $250.00 United States Savings Bonds, Series E. | $ 187.50 |
| 72 shares Atlas Chemical Industries, Inc., common | 730.59 |
| 1800 shares E. I. duPont de Nemours & Co., common | 0.00 |
| 900 shares General Motors Corporation, common | 43,200.00 |
| 2 shares Pulaski Realty Co., preferred | 0.00 |
| | $44,118.09 |
| Less "credit bal." | 44.50 |
| | $44,073.59 |

At the audit hearing on August 31, 1964, an additional credit for counsel fee to Guy E. Waltman of $2,150 was reported, thus increasing the credit balance by that amount and reducing the balance for distribution to $41,923.59.

At the first of the audit hearings, the hearing judge, G. E. Gangloff, since retired, stated that the account as stated and filed was not complete, and the accountant was asked to furnish data explaining the changes in the duPont shares of stock received in the decree of distribution of October 28, 1935. This data was furnished and filed September 13, 1963. So far as deemed necessary to be repeated here, this additional data may be summarized as follows:

(a) Letter of June 23, 1949, from duPont to its stockholders states "that effective on June 15, 1949,

each share of common stock of $20 par value would be reclassified and split into four shares of common stock of $5 par value"; accordingly, the trustee received four times 450 or 1,800 shares of duPont common stock, par value $5, as the result of the split four for one; the effective date of the split was June 23, 1949. Reference to the schedule of trust corpus now on hand, as stated above, shows that these 1,800 shares of du-Pont stock are carried in the records of the trustee at zero, notwithstanding the market value is substantially in excess of $400,000. The reason for this valuation of the duPont stock at zero will appear as we move along in our discussion.

(b) In a letter from duPont to its stockholders, dated May 31, 1962, it is stated:

"The Board of Directors today authorized the distribution of one-half share of common stock of General Motors Corporation for each share of common stock of the duPont Company. The distribution will be made July 9, 1962, to stockholders of record June 8, 1962.

"This is the initial step toward divestiture of the duPont's 63 million shares of General Motors stock in compliance with the final judgment entered March 1, in the U. S. District Court in Chicago by Judge Walter J. LaBuy. The judgment provides that the divestiture must commence by July 30, 1962, and be completed by February 28, 1965 . . .

"Under Public Law 87-403, the market value of General Motors shares will be treated as a return of capital to individual stockholders. This means there will be no tax to the individual stockholder on the initial or subsequent distributions unless and until the value of the General Motors shares he received exceeds the cost of the duPont stock. If it does, the excess will be treated as a capital gain on which the maximum tax rate is 25 per cent. On the basis of recent market prices of General Motors stock, a majority of duPont stock-

holders will have no tax to pay on the contemplated distributions. . . .

"Since the distribution is regarded as a return of capital, the stockholder will be required to subtract the value of the General Motors stock received from the costs of his duPont stock to arrive at a new tax cost basis for computation of capital gain or loss upon any subsequent sale of the duPont stock. The tax cost basis of the General Motors shares to individual stockholders will be their market value on the dates of distribution.

"For example, an individual who had paid $100.00 for a share of duPont stock and received a total of $75.00 worth of General Motors stock over the entire divestiture period would pay no tax upon the distributions. He would subtract the value received, $75.00, from his $100 cost to establish a new cost basis of $25.00 for his duPont stock. On subsequent sale of the duPont share, any amount received in excess of $25.00 would be taxable as a capital gain.

"If he owned another share of duPont stock, for which he had paid only $50.00, and received a total of $75.00 worth of General Motors stock, he would pay a maximum tax of $6.25—25 per cent of $25, the amount by which the value of the General Motors stock exceeded the cost of the duPont stock. He would reduce the cost basis of this duPont share to zero so that upon its subsequent sale the entire amount of the proceeds from the sale would be taxable as a capital gain.

"The foregoing discussion relates to the treatment of the distribution under Federal tax laws. . . ."

The accountant in the statement of proposed distribution poses the following questions:

"1. Does the General Motors stock received as a distribution from duPont accrue to the benefit of the income beneficiary (Sadie Rohrer Anthony) or the remaindermen?

"2. Is the income beneficiary (Sadie Rohrer Anthony) entitled to any of the increment in the value of the duPont stock since the inception of the trust?"

Sadie Rohrer Anthony, the last surviving life tenant, now deceased, filed the following objection to the account:

"1. The accountant has included the receipt of nine hundred (900) shares from duPont Company paid in shares of General Motors Corporation common stock as a principal asset of the trust estate, whereas the same should be included as income and distributed to the life tenant entitled thereto."

At the time of filing the account, the accountant had received 900 shares of General Motors as the original distribution on July 9, 1962, at $48 per share. Since the filing of the account, 648 shares were received on January 6, 1964, at $79 per share and final distribution was made on January 4, 1965, when accountant received an additional 900 shares at $96.0625 per share, making the total 2,448 shares of General Motors Corporation received as distribution from duPont, which is the number of shares on hand. Although accountant is using an account value, the present market value is substantially higher.

By agreement of counsel for the accountant and counsel for all other parties in interest, the second of the two questions posed by the accountant is not to be answered at this time, but with the understanding that this agreement on the part of the parties in interest is without prejudice and is not to be interpreted as either an affirmative or a negative answer to the question. Actually, therefore, there is no objection entered to the account as stated by the trustee other than that filed by Mrs. Anthony, testator's widow, the surviving life tenant under his will. To this should be added the agreement with respect to the second of the two ques-

tions posed by the accountant. The sole question for determination presently is whether the 900 (now 2,448) shares of General Motors Corporation stock received from duPont represent a distribution of income or principal or both. To find an answer to this question, the circumstances leading up to this distribution of General Motors Corporation stock should prove to be helpful.

We start with United States v. E. I. duPont de Nemours and Company, General Motors Corporation and others: 126 F. Supp. 235. The facts stated in that case, insofar as they are of interest here, are substantially that on December 21, 1917, duPont approved the acquisition of common stock of General Motors and Chevrolet Company in the amount of $25,000,000. General Industries, Inc., all of whose stock was held by duPont, was formed to acquire the General Motors-Chevrolet stock. By March 8, 1918, General Industries, Inc., had purchased approximately 23 percent of the common stock of General Motors-Chevrolet. During the next two years the investment was increased to approximately $49,000,000 and, in 1920, duPont owned approximately 23.9 percent of the outstanding stock of what is now known as General Motors Corporation. The acquisition was claimed to have been essentially an investment, and its motivation the profitable employment of a large part of the surplus which duPont had available and uncommitted to expansion of its own business. Up to 1923, duPont had invested $79,581,259 in General Motors stock, equivalent to 38 percent of the latter stock then outstanding. In 1923, duPont sold 2,250,000 shares and by 1938 it owned 10,000,000 shares or approximately 23 percent of General Motors stock then outstanding. In 1950, a two for one split was effected, resulting in duPont then holding 20,000,000 out of 88,000,000 shares, which did not change the percentage of duPont holdings in General Motors stock.

In United States v. duPont, 126 F. Supp. 235, the contention of the government was that duPont, in acquiring the General Motors stock, had violated the Sherman Act and the Clayton Act. The District Court, speaking through Judge LaBuy, held December 3, 1954, that there was no violation of either act and dismissed the action. On appeal, the United States Supreme Court in United States v. duPont de Nemours & Co., 353 U. S. 586, held, inter alia, that acquisitions solely for investment of the stock of one corporation by another corporation are lawful under section 7 of the Clayton Act, 38 Stat. 731, only if, and so long as, the stock is not used by voting or otherwise to bring about, or in attempting to bring about, substantial lessening of competition; that the acquisition of the General Motors stock and its retention by duPont brought about such substantial lessening of competition, and on June 8, 1957, the following decree was entered:

"The judgment must therefore be reversed and the case remanded to the District Court for determination after further hearing, of the equitable relief necessary and appropriate in the public interest to eliminate the effects of the acquisition offensive to the Statute."

It appears that by the end of 1961, as a result of stock splits and the exercise of rights to purchase, the number of shares of General Motors held by duPont had increased to 63,000,000.

Pursuant to the decree of the Supreme Court of the United States entered June 8, 1957, the District Court for the Northern District of Illinois refused to order complete divestiture of the General Motors stock, as required by the government, but ordered a divestiture only of voting rights in the stock. The decree also enjoined duPont from exercising voting rights in respect of its General Motors stock. On appeal, the Supreme Court of the United States, in United States v. E. I. du-

Pont & Co., 366 U. S. 316, vacated the judgment of the district court, except as to the provision enjoining duPont from exercising the voting rights, and directed complete divestiture. The Supreme Court remanded the case to the district court with instructions that a judgment be entered against duPont requiring it to divest itself of all its General Motors stock within a period of 10 years in such manner and by such means as it might elect, such divestiture to be commenced within 90 days of the date of the final judgment of the district court. On March 1, 1962, Judge LaBuy, of the district court, entered a judgment which by its terms was to become final on May 1, 1962. The judgment ordered divestiture by duPont of its 63,000,000 shares of General Motors stock by distribution to its shareholders or, in the alternative, by such methods as it might elect, such divestiture to commence not later than July 30, 1962, and to be completed by February 28, 1965.

In 1962, section 1111 was added to the United States Internal Revenue Code, subsection (a) of which provides, 26 U. S. C. A. §1111, 76 Stat. 4:

"General Rule. Notwithstanding Sections 301, 312 and 316, a distribution of divested stock (as defined in subsection (e)) to a qualifying shareholder (as defined in subsection (b)), to which section 301 (c) (1) would, but for this section, apply, shall be a distribution which is not out of the earnings and profits of the distributing corporation for purposes of this subtitle."

And subsection (e) of 1111 provides:

"divested stock means . . . stock subject of an antitrust order entered after January 1, 1961, which (A) directs the distributing corporation to divest itself of such stock by distributing it to its shareholders (or requires such distribution as an alternative to other action by any person); (B) specifies and itemizes the stock to be divested; and (C) fixes the period of time

within which the distributing corporation must divest itself . . ."

In connection with the above amendment of the United States Code, the following observation is made in Commerce Clearing House, Federal Taxes, 1963, sec. 2702, p. 2502:

"Although not readily apparent on their faces, these provisions apply to distributions of General Motors Company stock by duPont Corporation resulting from antitrust litigation against duPont. Under the divestiture order which requires duPont to distribute its holdings of General Motors stock to duPont stockholders, non-corporate shareholders of duPont stock are to treat the fair market value of the General Motors stock received *as a return of capital*—that is, it is to reduce their basis in their duPont stock. Any excess will be treated as capital gain." (Italics supplied.)

A summary of what has been developed thus far may be in order:

(a) Back in 1917, E. I. duPont de Nemours and Company invested $25,000,000 in the common stock of what is now General Motors Corporation; during the next two years the investment was increased to approximately $49,000,000, and by 1920 duPont owned approximately 23.9 percent of the General Motors Corporation common stock. Up to 1923, duPont's investment in General Motors Corporation stock amounted to $79,581,259, equivalent to 38 percent of General Motors Corporation outstanding shares of common stock; during 1923, duPont sold 2,250,000 shares of its General Motors Corporation stock, and by 1938, duPont owned 10,000,000 shares of General Motors Corporation common stock, or approximately 23 percent. Since then, through stock splits and rights exercised, duPont held by the end of 1961 a total of 63,000,000 shares of General Motors Corporation common stock.

(b) The General Motors Corporation common stock

was paid for out of "surplus which duPont had available and uncommitted to expansion of its own business."

(c) The trust created in the will of Thomas J. Anthony, the testator here, became operative upon his death on February 26, 1935, *at which time duPont had completed the investment of its funds in General Motors Corporation* except what was required to exercise any rights to purchase General Motors Corporation stock given to holders of General Motors Corporation stock after February 26, 1935.

(d) The purchase money for the General Motors Corporation stock acquired by duPont obviously was paid out of funds of the latter corporation *earned or accumulated prior to the time the Thomas J. Anthony trust began to function as a trust,* the income of which is payable to the life tenants named in the will (it is possible that, in the exercise of rights issued by General Motors, duPont may have used funds charged to accumulated income earned after February 26, 1935; if this is so, the burden of proving that the income beneficiary of the Anthony trust had a vested interest in this income, as defined in Catherwood Trust, supra, would be upon the income beneficiary).

(e) The so-called investment by duPont in General Motors Corporation common stock was found to be in violation of the Sherman and Clayton Acts (Federal): U. S. v. duPont de Nemours & Co., 353 U. S. 586.

(f) duPont was directed in 1962 to divest itself of all of the 63,000,000 shares of General Motors Corporation common stock by distribution of these shares to its stockholders "or in the alternative, by such methods as it might elect, such divestiture to commence not later than July 30, 1962, and to be completed by February 28, 1965": U. S. v. duPont & Co., 366 U. S. 316;

and decree by Judge LaBuy of the United States District Court, March 1, 1962.

(g) According to section 1111 of the Internal Revenue Code, a distribution of divested stock "shall be a distribution which is not out of the earnings and profits of the distributing corporation"; and wherein "divested" is defined as "stock subject to an antitrust order entered after January 1, 1961, which (A) directs the distributing corporation to divest itself of such stock by distributing it to its shareholders (or requires such distribution as an alternative to other actions by any person); (B) specifies and itemizes the stock to be divested and (C) fixes the period of time within which the distributing corporation must divest itself." Obviously, this section 1111 covers the situation in which duPont found itself under the decisions of the District and the Supreme Court.

(h) Under authority of section 1111 of the Internal Revenue Code, duPont's board of directors authorized the distribution of one-half share of General Motors Corporation common stock for each share of duPont, and on July 9, 1962, the Anthony trust here under consideration received 900 shares as its share of this distribution. Accompanying this distribution was the explanatory letter sent by duPont to its shareholders, the contents of which, so far as applicable here, have been quoted hereinbefore. This letter clearly points out that the distribution is to be regarded as a "return of capital" and, as already noted, that is how the trustee in the case at bar regarded the receipt by it of 900 shares of General Motors Corporation stock. As already pointed out, additional distribution of the General Motors Corporation stock has been made, thereby adding 1,548 shares to the 900 shares or a total of 2,448 shares.

In Catherwood Trust, supra, the subject matter

was an inter vivos trust created in 1924, whereby the net income from 1,896.72 shares of American Gas and Electric Company, now American Electric Power Company, was payable to the settlor's two children for their lives, both of whom are living, with remainder over to their descendants per stirpes; settlor was deceased. In the present case, we have a like situation but created by will instead of by inter vivos trust agreement, and what is said in Catherwood Trust is applicable here. We quote from the opinion of the court in that case, pages 66-7:

"In Nirdlinger's Estate, 290 Pa. 457, 462, 463, 464, 465, 139 A. 200 (1927) this Court pointed out that when the earnings of a corporation whose stock forms part of the trust have been permitted to accumulate by a corporation and their proceeds invested in corporate property, in working capital, or retained as cash or its equivalent, and an extraordinary dividend is declared in stock or cash, the respective rights of life tenants and remaindermen were adjudicated under three rules—the Massachusetts, Pennsylvania and Kentucky rules. Under the Massachusetts rule—one of convenience—all cash dividends are awarded to the life tenant and all stock dividends to the remainderman: Minot v. Paine, 99 Mass. 101. . . . Under the Pennsylvania rule the rights of the life tenant and remainderman to an extraordinary cash or a stock dividend declared during the life tenancy are determined by a division of the dividend between the claimants so as to preserve intact the book value of the devised property (the corpus) as it existed at testator's death (or in the case of an inter vivos trust, at the time of its creation), and the effect of the rule is to give to the life tenant the income which has been earned since the trust came into being, but, at the same time, to preserve the value of the corpus as it was or to preserve the intact value of the estate . . ."

Page 701:

"The present situation of the law constitutes an 'apportionment morass' as President Judge Klein so aptly stated. If a trust was created prior to May 3, 1945, the Pennsylvania Rule of apportionment now governs; if a trust was created thereafter, *the Massachusetts Rule, codified by the legislature, governs.* Orphans' Courts now have three different sets of apportionment formulas to apply: (1) for trusts created prior to May 3, 1945; (2) for trusts created between May 3, 1945, and before July 3, 1947; (3) for trusts created after July 3, 1947. Under the present state of the law the Pennsylvania Rule must be applied to all trusts created prior to May 3, 1945; its application will continue until the last of such trusts terminates, conceivably many, many years in the future." (Italics supplied.)

The court then considers the Principal and Income Act of 1947 and its retroactive provisions and states, inter alia (pages 71-2):

"The constitutionality of a retroactive operation of the Act will depend on the existence or nonexistence of any vested property right in the life tenants or remaindermen subject to interference by the legislative enactment.

"Certain principles of law are beyond dispute: (1) *a gift of an equitable life estate in income or of an estate in remainder does constitute a grant of a vested property right of which the recipients cannot be divested by legislative action;* (2) a vested property right cannot exist in a rule of law, although a rule of law may establish a vested right; (3) where an interest is declared vested by this Court, such interest cannot be altered or extinguished by the retroactive effect of any statute. That these life tenants have a vested property right in the income from this trust

cannot be questioned. Stated otherwise, *if there be income arising from the trust, in such income the life tenants have such a property right that brooks no legislative interference.* The present Act in nowise alters or extinguishes a right to the income arising from the trust.

*"It does not follow, however, that these life tenants have any vested interest in the accumulated unpaid earnings of a corporation,* the stock of which is held in the trust or a vested interest in any particular apportionment formula for the ascertainment of such earnings. *Even though a corporation be highly successful, its earnings may never reach either the dividend stage or an earned surplus account.* Corporate earnings may be siphoned off in innumerable ways; in salaries, bonuses, advertising, plant expansion, research, building up of inventory, and through a myriad of other expenses and investments. Reserves may be set up for countless objects and these reserve accounts credited instead of the earned surplus account. *How great a corporation's accumulated earnings on its books are and, indeed whether the corporation shows any accumulated earnings at all is a function of the particular accounting procedure employed by the corporation. It could be just as logical to reason that the life beneficiary of a trust has a vested interest in the particular accounting procedure employed by a corporation at the date that one or more of its shares become a part of the trust corpus as to reason that the life beneficiary has a vested interest in a particular apportionment formula to ascertain the accumulated earnings of the corporation . . ."*

Page 74:

"Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present inter-

est. Such rights these life tenants have in the income from this trust *but they have no rights to accumulated unpaid earnings of a corporation nor to any particular mode or method of ascertaining what is or is not income; to hold otherwise would produce absurd results* . . .

Page 76:

"The apportionment problems which confront trustees today, as the result of such holdings, create administrative problems of such complexity as to make the management of trust estates a truly nightmarish experience. *It is utterly unrealistic to expect trustees to be compelled to analyze the intricate financial statements of mammoth multi-million dollar corporations every time a stock dividend is declared, or a share of stock sold.*" (Italics supplied.)

Finally, the Supreme Court in Catherwood Trust ruled that the retroactive provisions of the Principal and Income Act of 1947 are valid, thereby abolishing the Pennsylvania Rule of Apportionment and that, page 78, "In all audits now pending and henceforth, distributions shall be made under provisions of the Principal and Income Act of 1947."

There is a footnote to this final ruling calling attention to distributions of six percent or less, but with this we are not here concerned.

As already mentioned, Catherwood Trust rules that the Principal and Income Act of 1947 and its amendments govern in a trust such as we have here. Section 3(1) of the act provides:

"(1) Returns from use of principal. All receipts of money or other property paid or delivered as rent of realty, or hire of personalty," or corporate distributions deemed to be income under section 5, ". . . or otherwise in return for the use of principal, shall be

deemed income, *unless otherwise expressly provided in this act.*

"(2) Receipt from sale or transfer of property. *All receipts of money or other property paid or delivered . . . as a refund or replacement or change in form of principal, shall be deemed principal, unless otherwise expressly provided in this act.* Any profit or loss, resulting from any change in form of principal, shall enure to or fall upon principal, unless otherwise expressly provided in this act." (Italics supplied.)

Section 5 of the act provides, 20 PS §3470.5(1):

"(1) Corporate distributions made to a trustee in the shares of the distributing corporation however described or designated by the distributing corporation shall be deemed principal but if the number of shares of any class distributed to shareholders of such class is six per cent (6%) or less of the number of shares of that class outstanding on the record date for such distribution the shares so distributed shall be deemed income. *Except as provided above and in other subsections of this section* all dividends payable otherwise than in shares of the distributing corporation including ordinary or extraordinary cash dividends and dividends payable in shares or securities or obligations of corporations other than the distributing corporation shall be deemed income. . . .

"(3) Liquidation of corporate assets. Where the assets of a corporation are liquidated, wholly or partially, amounts paid upon corporate shares as dividends, declared before such liquidation began, or as arrears of cumulative preferred, or guaranteed dividends shall be deemed income, all other amounts paid upon corporate shares on disbursement of the corporate assets to the stockholders shall be deemed principal. *All disbursements of corporate assets to the stock-*

*holders, whenever made, which are designated by the corporation as a return of capital or division of corporate property, shall be deemed principal.* Any profit or loss resulting from the sale or liquidation of corporate shares shall enure to or fall upon principal."

Section 236 (e) of the Restatement, Trusts 2d, states the following in regard to "Receipts from shares of stock":

"Upon the total or partial liquidation of the corporation during the period (of the trust), amounts paid as cash dividends declared before such liquidation occurred or as arrears of preferred or guaranteed dividends are income; all other amounts paid upon corporate shares on distribution of the corporate assets to the shareholders are principal."

The comment on clause (e) states:

". . . Where a corporation is directed by public authority to cease to hold shares of a subsidiary corporation, and it distributes such shares among its shareholders, such distribution may be held to be in the nature of a partial liquidation and allocable to principal."

General Motors, of course, is not a subsidiary of duPont, but the nature of the holding would seem to dictate application of the same rule. See August 1962 issue of Fiduciary Review. Section 236 (f) of the Restatement, Trusts 2d, further states:

"A distribution by a corporation which is a return of capital and not a distribution of earnings is principal."

The Orphans' Court of Philadelphia has recently had the problem raised in Steel Estate, 32 D. & C. 2d 553. There, Judge Shoyer held that the accountant properly charged itself with 300 shares of General Motors as principal when these shares were received as a result of the duPont distribution.

The shares of General Motors Corporation stock distributed by duPont are principal. That this is the only conclusion warranted clearly appears in the foregoing somewhat lengthy discussion and more particularly because of the following: (a) The fact that the General Motors stock, except the shares, if any, purchased after the death of testator through the exercise of rights, were acquired by duPont before the creation of the Anthony trust; (b) the action of the duPont Board of Directors in designating the distribution of General Motors stock as a "return of capital"; (c) the provisions of section 1111 of the United States Internal Revenue Code; (d) the action of our Supreme Court in declaring the Principal and Income Act of 1947 to be retroactive in its provisions; (e) sections 3(1), 3(2), 5(1) and 5(3) of the Principal and Income Act of 1947; and, finally, section 236 (e) and section 236(f) of the Restatement, Trusts 2d.

Accordingly, we hereby approve and confirm the action of the accountant in accounting for the 900, now 2,448, shares of General Motors Corporation as principal.