**UNITED STATES of America, Plaintiff,**

v.

**CITIES SERVICE COMPANY, Cities Service Oil Company, Chelsea Terminals, Inc., and Jenney Manufacturing Company, Defendants.**

**Civ. A. No. 68–213–J.**

United States District Court
D. Massachusetts.

June 27, 1968.

Ramsey Clark, Atty. Gen., Donald F. Turner, Asst Atty. Gen., Baddia J. Rashid, Director of Operations, Allen A. Dobey, Atty., Dept. of Justice, Paul F. Markham, U. S. Atty., Harry W. Cladouhos and George H. Hempstead, III, Attys., Dept. of Justice, Antitrust Division, Washington, D. C., for plaintiff.

James D. St. Clair, Harold Hestnes, Hale & Dorr, Boston, Mass., for defendants Cities Service Co., and others.

Robert E. Sullivan, Kevin Hern, Boston, Mass., for defendant Jenney Manufacturing Co.

### MEMORANDUM

JULIAN, District Judge.

This matter is before the Court on the motion of Cities Service Oil Company (hereinafter "Cities") for an order allowing Cities to sell its petroleum storage terminal facilities in Chelsea, Massachusetts. Affidavits were submitted by both sides and an evidentiary hearing was held on May 20, 1968.

The underlying suit is a civil antitrust action brought by the Government under

Section 7 of the Clayton Act, as amended (15 U.S.C. § 18), seeking to divest Cities of the petroleum business, and assets in connection therewith, of Jenney Manufacturing Company (hereinafter "Jenney"), which Cities acquired in 1963,[1] and the complete restoration of Jenney as a substantially independent marketer. On May 1, 1968, pursuant to a stipulation of all parties, this Court issued an order which, among other things, prohibited Cities, pending further order of the Court, from making

> "any changes * * * in, or disposition of, facilities and properties acquired from Jenney in Cities' possession or under its control as of the date said complaint was filed other than in the routine course of business, [and ordering Cities to] exercise good faith and due diligence in preserving and maintaining the integrity and viability of the Jenney properties referred to in paragraph 16 of the complaint. * * *"

Among the Jenney properties referred to in paragraph 16 of the complaint is the petroleum storage terminal at Chelsea, which Cities now seeks to sell. Cities represents that it has a prospective buyer; that the property is no longer economically suitable for use as a terminal facility for the distribution of gasoline and related petroleum products by Cities; that it would no longer be suitable for use by Jenney as a terminal facility in the event that divestiture is ordered; and that Jenney would have available to it alternative facilities to meet its terminal requirements which could be operated or leased at costs lower than the cost of operating the Chelsea terminal.

The Government opposes the motion on the ground that the sale of the terminal facility would seriously impair the Court's ability to fashion relief that would effectively restore Jenney as a viable, substantially independent, competitive marketer of petroleum products should the Government prevail on the merits.

The Government contends that it is essential that the Chelsea terminal be kept available for possible return to Jenney since there is no assurance that Jenney could acquire, by lease or otherwise, similar facilities in the Boston area through which to receive petroleum products.

The Chelsea terminal is a deep-water petroleum storage terminal located on the shore of the Chelsea River in Boston Harbor. It is designed to receive petroleum products from ocean-going tankers into on-shore storage tanks from which the products are later pumped into trucks for delivery to marketing outlets such as gasoline service stations. The terminal enjoys an advantageous location for the storage of refined petroleum products because it is situated north of Boston with access to major highways leading to northern and western Massachusetts, New Hampshire and Maine. Jenney for many years had been the leading independent marketer of such products in Massachusetts and New Hampshire.

The terminal's truck-loading facilities, consisting of 10 loading spots, and the other buildings, such as the terminal office, warehouse, and truck repair shop, are in good condition and adequate for their present use.

Out of approximately 20 acres of land, 9.48 acres are zoned and licensed for the storage of petroleum products. The remaining 10 acres, not being so zoned and licensed, are vacant.[2] The on-shore

---

1. The complaint (paragraph 16) alleges that in 1963 Cities acquired from Jenney, in addition to the terminal facility here involved, leases to 220 service stations owned by Jenney in fee, Jenney's rights under 62 leases to owner-operated service stations, certain other rights and petroleum marketing equipment owned by Jenney.

2. Although the record contains references to efforts by Jenney and Cities to obtain zoning changes which would enable expansion onto the 10 vacant acres, no reliable evidence has been presented to show that this has been attempted or, if it has, with what result and why.

storage facilities, covering 6.9 acres of the zoned land, consist of 15 storage tanks ranging in capacity from 6,000 to 67,000 barrels, for a combined capacity of approximately 371,000 barrels. Twelve of the tanks, with a combined capacity of 230,000 barrels (62 per cent of the total capacity), were constructed between 1929 and 1933, thus having an average age of 36 years. The remaining 3 tanks, with a combined capacity of 141,000 barrels (38 per cent of the total) are approximately 19 years old. There is nothing in the evidence to indicate that the tanks are not in good condition. Because they have not been equipped with modern conservation systems, they annually lose through evaporation approximately .5 per cent of their contents, the maximum evaporation rate tolerable in the industry, at an annual loss of between $40,000 and $45,000.

In 1966, the Army Corps of Engineers completed dredging the channel in the Chelsea River portion of Boston Harbor to a mean low depth of 35 feet and a maximum depth of 44 feet.

The 925-foot ship dock, erected during the early 1930's, has a dockside water depth at mean low tide of 30 feet and, at mean high tide, of 39 feet.[3] The dock is capable, despite Cities' contention to the contrary, of receiving fully loaded 34,-000-ton, 600-foot-long, 240,000-barrel-capacity, 35-foot-draft supertankers of the type increasingly used by major oil companies including Cities, if the tankers are berthed during high tide thus permitting the draft to decrease as the product is unloaded. This is the normal practice being used successfully by petroleum companies in receiving and unloading supertankers at terminals contiguous to or near the Chelsea terminal having the same mean low tide water depth of 30 feet.

Since acquiring Jenney's properties in 1963, Cities has divided its "thruput" operations (transfer of refined petroleum from tanker to storage tank to delivery truck) between the Chelsea terminal and Cities' other terminal located on the Weymouth-Fore River in East Braintree, about 14 land miles from the Chelsea terminal. Cities' recent and present practice consists of partially unloading its supertankers at East Braintree, then completing the unloading at Chelsea. The Court is satisfied that this two-point unloading practice is not made necessary by the alleged deficiency of the water depth alongside the Chelsea terminal as claimed by Cities.

If, as Cities contends, the East Braintree facilities are less than half as expensive to operate as the Chelsea terminal, it is a mystery why Cities has continued to use the Chelsea terminal at all. This is even more difficult to understand in view of Cities' assertion that the East Braintree facility has an excess, unused capacity sufficient to enable it to accommodate all of the "thruput" business of a reconstituted Jenney.

Cities expects to complete the installation at East Braintree within the year of equipment which would reduce storage tank evaporation to a negligible amount. No evidence was offered suggesting that similar equipment could not be installed at Chelsea, or showing the cost of installing such equipment at either site.

The Court is not satisfied by the evidence that, if the Chelsea terminal were now sold, a reconstituted Jenney could find alternative terminalling facilities in the Boston Harbor area adequate for its present[4] and, perhaps greater, future requirements, and as economically as it could through the existing Chelsea terminal. Nor is it clear that a reconsti-

---

3. This appears in the affidavit filed by Arthur J. Kelley, Chief of the Permits and Statistics Branch, Operations Division, U. S. Army Corps of Engineers, New England Division.

4. Approximately 80 million gallons of refined gasoline annually.

tuted Jenney might not expand the present Chelsea capacity onto the 10 acres now vacant.

Finally, Cities concedes that an alternative, from its viewpoint, to sale of Chelsea terminal might be the leasing of the terminal to a third party pending disposition of the suit, with a binding undertaking by Cities, in the event of divestiture, to handle Jenney's thruput needs pending expiration of the lease.[5] Neither Cities nor the Government, however, has explored this alternative.

In the absence of reasonably definite assurance of the availability of other adequate terminal facilities, the sale of the Chelsea terminal now would probably prove to be a major step in the permanent dismantling of Jenney as an integrated system for the distribution of refined petroleum products and raise an insuperable obstacle to the restoration of Jenney as a viable, substantially independent enterprise, should divestiture be ultimately ordered.[6]

I conclude that the proposed sale of the Chelsea terminal by Cities would either render impossible or severely limit the fashioning of an effective remedy should the Government prevail on the merits. Accordingly, Cities' motion for an order approving the sale of the Chelsea terminal facilities is denied.

5. See Transcript of hearing, pp. 14–15, 19–20.

6. It is pertinent, in this connection, to recall what was stated by the Supreme Court in United States v. E. I. du Pont de Nemours & Co., 1961, 366 U.S. 316, 81 S.Ct. 1243, 6 L.Ed.2d 318:
    "The proper disposition of antitrust cases is obviously of great public importance, and their remedial phase, more often than not, is crucial. For the suit has been a futile exercise if the Government proves a violation but fails to secure a remedy adequate to redress it." (At page 323, 81 S.Ct. at page 1249.)
    "The very words of § 7 suggest that an undoing of the acquisition is a natural remedy. Divestiture or dissolution has traditionally been the remedy for

Sherman Act violations whose heart is intercorporate combination and control * * *." (At page 329, 81 S.Ct. at page 1251.)
    "If the Court concludes that other measures will not be effective to redress a violation, and that complete divestiture is a necessary element of effective relief, the Government cannot be denied the latter remedy because economic hardship, however severe, may result. Economic hardship can influence choice only as among two or more effective remedies. If the remedy chosen is not effective, it will not be saved because an effective remedy would entail harsh consequences. This proposition is not novel; it is deeply rooted in antitrust law and has never been successfully challenged." (At page 327, 81 S.Ct. at page 1250).